PRUDENTIAL TRUST COMPANY *vs.* FRED N. MOORE.
SAME *vs.* JAMES T. BARRETT.
SAME *vs.* MAX C. CORNEZ & others.
SAME *vs.* CHARLES D. MALAGUTTI & another.
SAME *vs.* REGINALD W. P. BROWN & others.
SAME *vs.* GEORGE H. CARRICK & another.
SAME *vs.* JOHN W. LINNEHAN & another.

Suffolk.    March 20, 1923. — May 25, 1923.

Present: RUGG, C.J., DECOURCY, CROSBY, PIERCE, & CARROLL, JJ.

*Bills and Notes*, Consideration, Validity. *Trust Company. Corporation*, Officers and agents. *Estoppel*.

A trust company, through acts of the president and of the treasurer, which had been concealed from the executive committee of the board of directors and which should have been passed upon by that committee, had made loans to and suffered overdrafts by a corporation $110,000 in excess of the amount allowed by law. At a time when it appeared to the president that that corporation was on the verge of bankruptcy and after the commissioner of banks had asked for a daily statement of the condition of the trust company, the president summoned to the trust company's office ten of its twenty-seven directors for a conference, but not for a meeting of directors, and falsely stated to them that he just had learned as to the loans and overdrafts above described, that the commissioner of banks, to whom he had stated the facts, had promised to give him a short period of time in which to straighten out the matter, that the debtor corporation had plenty of assets, was perfectly solvent and in sound financial condition, that the loans to it were good, and that the situation involved merely a technical question and required a temporary arrangement to save the trust company. Relying upon his representations and believing that they were true, at his request seven of the ten directors each gave his note to the trust company for $12,500 and the president gave to each of them his personal note for the same amount. He assured them that they were really assuming no liability at all. Four months later the commissioner of banks took possession of the property and business of the trust company and suits upon the notes were brought. *Held*, that

(1) There was consideration for each note;

(2) The representations made by the president were made and received as though made by an individual to individual co-directors and had no binding effect upon the trust company;

(3) There was no fraud of the trust company which was a defence to the suits upon the notes;

(4) The defendants by reason of their conduct were estopped to deny the validity of their notes.

Two ACTIONS OF CONTRACT AND FIVE SUITS IN EQUITY, each based upon a promissory note for $12,500, made by a director of the plaintiff and payable to the plaintiff, each suit in equity being to reach and apply to the payment of the note equitable assets of the maker. Writs in the actions at law dated, respectively, February 17 and March 17, 1921; the bills in equity against Cornez and Malagutti being filed on March 30, and the other three being begun by writs of summons and attachment dated March 17, 1921.

The defence in the actions and suits were, alike, lack of consideration and that the notes were procured by fraud, deceit, or false and fraudulent misrepresentation on the part of the plaintiff or of a person acting in its behalf. In the suits in equity, issues upon these questions were framed for the jury, and those issues and the actions at law were consolidated and tried together before *Morton*, J. Material evidence and proceedings at the trial are described in the opinion. The judge ordered verdicts for the plaintiff in the actions at law and made a report of all the cases to this court upon the stipulation described in the opinion.

*H. V. Cunningham*, (*W. S. Bangs* with him,) for the plaintiff.

*A. T. Smith*, for the defendants.

DeCOURCY, J. The cases against Moore and Barrett are actions at law, and those against the other defendants are suits in equity to reach and apply assets. They were brought to recover on certain promissory notes, each for the sum of $12,500, dated May 4, 1920, payable on demand to the Prudential Trust Company, and admittedly signed by the defendants respectively. The defence set up in each case was lack of consideration and fraud. The causes were tried together; issues for the jury on these defences having been framed in the equity suits. The plaintiff rested after putting the notes in evidence. The defendants introduced the testimony of John H. H. McNamee, president of the trust company, and made an offer of proof. Thereupon the trial judge ruled that upon the admitted facts there was a valid consideration for the giving of the notes; he excluded the testimony of McNamee and the offer of proof, so far as the

question of fraud was affected thereby, on the ground that, if true, no defence was shown: and he directed the jury to return verdicts for the plaintiff in the actions at law, — to all of which the defendants duly excepted. The evidence as to lack of consideration and fraud is applicable both to the actions at law and the suits in equity. The questions of law involved were reported to this court on the following stipulation of counsel: " If the rulings were wrong and the evidence should have been submitted to the jury on said issues, or either of them, then the said issues, or either of them as the case may be, are to stand for trial in all the cases; if the rulings were right, the verdicts in the two law cases are to stand, and the decision of the Supreme Judicial Court thereon is to be applicable to and control the rights and obligations of the parties in the equity suits so far as these two issues are concerned."

The following material facts could be found from said testimony and the offer of proof made by the defendants: McNamee was president and chief executive officer of the bank; he knew that the legal limit of a loan to any person was $40,000 and was familiar with the daily statement of condition of the commercial department and with all overdrafts. The Boston Dredging Company began to borrow from the bank in May, 1919, and in July the board of directors extended to it a credit of $20,000. The by-laws required the approval of the executive committee of the board as to all loans; that committee might authorize the president or treasurer to make loans without first consulting them, but they must be recorded in a discount book, to be shown at each meeting of the committee for their approval.

On May 4, 1920, McNamee summoned to the bank by telephone ten of the twenty-seven directors, including the seven defendants, for a conference. It was not a meeting of the board of directors. He told them, in substance, that he had just learned that the Boston Dredging Company had loans with the bank and overdrafts to the amount of $150,000, thus exceeding the legal limit by $110,000; that the bank commissioner, to whom he had stated the facts, promised to give him a short period of time to straighten out the

matter; that the Boston Dredging Company had plenty of assets, was perfectly solvent and in sound financial condition, and the loans to it were good; that the situation involved simply a technical question — that of loaning to one person more than the law allowed — and could be arranged in a few days; but that, in the meantime, owing to the attitude of the bank commissioner, a temporary arrangement must be made in order to save the bank. He asked each of those present to execute a note for $12,500 payable to the bank; said he would discount these with the bank, and would take up the loans of the Boston Dredging Company with the checks signed by each for the proceeds of such discount; that to secure the defendants he would give each his personal note for $12,500; and that in a few days he would straighten out the matter, pay the defendants' notes to the bank, and get back his own notes, which meanwhile were to be placed in the hands of three trustees. He assured the defendants that they were really assuming no liability at all.

The representations of McNamee were knowingly false in the following particulars, according to the offer of proof; the bank commissioner did not require him to take the notes of the Boston Dredging Company from the bank within a certain time, but asked for a daily statement of the bank's condition; the Boston Dredging Company had not been in a sound financial condition for some months, and was on the verge of insolvency on May 4, 1920; the loan to that company was not good, and the situation did not involve simply a technical question of loaning more than the law allowed. The loans and overdrafts to the dredging company were made by McNamee and Bailey (the treasurer), and were concealed from the executive committee; and nothing had occurred to put the defendants upon their inquiry with regard to the integrity or truthfulness of McNamee or Bailey, or with reference to the relations between the bank and said dredging company. The offer of proof added that the defendants were deceived by these representations, and relied upon them in signing the notes in suit; they did not personally receive any of the proceeds, and that they did

not ascertain the truth with reference to the matters covered by said representations of McNamee until after demand was made on them for the payment of the notes, which was subsequent to September 10, 1920, when the bank was closed. The interest and the revenue stamps on the notes had been paid by McNamee.

In considering the defences of want of consideration and fraud, it is necessary to have in mind the purpose of the defendants in signing these notes, and their obligations as directors. On May 4, 1920, they were informed that $110,000 of the money of the trust company had been illegally loaned to the Boston Dredging Company, and that in order to prevent the closing of the bank by the bank commissioner it was necessary to replace the $110,000 of excess notes with cash or good assets. McNamee and the defendants had not only a financial interest as stockholders in maintaining the solvency of the bank, but as directors they were under legal responsibility akin to that of trustees. In *Greenfield Savings Bank* v. *Abercrombie,* 211 Mass. 252, where the liability of trustees of savings banks was discussed, it was said (page 256): "For honest errors of judgment, while acting with ordinary skill and prudence, measured according to the demands of the duties or business which they have taken upon themselves, they are not to be held liable; but they cannot excuse themselves from the consequences of their misconduct or of their ignorance or negligence by averring that they have failed merely to exercise ordinary skill, care and vigilance." The same standard of liability was held applicable to directors of a trust company with a savings department, in *Cosmopolitan Trust Co.* v. *Mitchell,* 242, Mass. 95, 120. The management, control and direction of the Prudential Trust Company was vested in the board of directors: and it was the legal duty of the individual defendants to exercise reasonable diligence in safeguarding the interests of depositors and other creditors. So far as disclosed by the record these defendants not only allowed McNamee, the president, to make any loan he pleased, in disregard of the by-laws, but they made no inquiries, when an examination would have disclosed that for months the

dredging company had been depleting the assets of the bank by illegal loans and overdrafts.

As to the notes in suit, manifestly there was consideration given for them by the bank when it discounted them. On the issue of fraud, it is difficult to see how the misrepresentations made by their co-director McNamee can be regarded as statements of an officer of the bank, made while acting for it and within the scope of his official duties. They were apparently dealing with him as an individual and they took his personal notes as security for the risk they were assuming in a common undertaking. The gist of the representations was an assurance that their liability would be only nominal, and that payment of the notes would not be enforced by the bank. But the president had no authority to bind the bank by such an agreement; and evidence in support of such an agreement was incompetent. *Davis* v. *Randall*, 115 Mass. 547. *Indian Head National Bank* v. *Clark*, 166 Mass. 27. 28 L. R. A. (N. S.) 501, note. Further, a short answer to both defences is that the defendants are estopped from denying the legal validity of these notes, which the bank commissioner is now attempting to collect for the benefit of creditors of the bank. They knew when they signed the notes that the assets of the bank were materially impaired by illegal loans to the dredging company; and that the proceeds of the notes in suit were to be used to prevent the closing of the bank. They knew that these new assets would enable the bank to continue doing business, retain deposits of existing customers, and presumably obtain new deposits and credits. To permit the defendants, who by these notes enabled the bank to appear to the public as a solvent concern, now to plead the invalidity of the very securities by which they induced others to make and leave deposits with the bank, would be unjust and fraudulent. *Hurd* v. *Kelly*, 78 N. Y. 588. *Best* v. *Thiel*, 79 N. Y. 15. *Union Bank of Brooklyn* v. *Sullivan*, 214 N. Y. 332. *Skordal* v. *Stanton*, 89 Minn. 511. *State Bank of Pittsburgh* v. *Kirk*, 216 Penn. St. 452. *Utah National Bank* v. *Nelson*, 38 Utah, 169.

In accordance with the report, the verdicts in the two law cases are to stand; and in each of the suits in equity a decree is to be entered establishing the debt.

*Ordered accordingly.*