GOSS *v.* KELVINATOR CORP.

1. CORPORATIONS — PRESIDENT — AUGMENTATION OF ASSETS — REIM-
BURSEMENT.

President of corporation who was a director, member of its ex-
ecutive and financial committees, owner of one-sixth of its
capital stock, who received large salary and who contributed a
large sum to augment its assets in order to make good a
previously published statement as to its profits *held,* not en-
titled to recover amount so paid from corporation, where
record shows he was personally responsible for losses and ex-
penditures aggregating such sum, had sufficient personal in-
terest in making good the false report to afford consideration
for doing so, no fraud was perpetrated upon him by corpora-
tion in inducing him to do so, and that failure of its options
to him to purchase its stock to reimburse him for amount paid
was due to decline in market value of stock, there being no
guarantee that the options would reimburse him since the ex-
istence of such liability on part of corporation would have
defeated purpose of augmentation.

2. SAME—OPTIONS TO PURCHASE STOCK.

Contention by president of corporation that options to purchase
its stock were given to other parties on terms more favorable
than those given him *held,* without merit in his suit to recover
sum he contributed to corporation to make good a false report
as to its profits, where it is not shown that other options so
depressed market as to prevent him from reimbursing himself
in accordance with plan devised for such purpose, especially
where he approved other options.

Appeal from Wayne; Ferguson (Homer), J. Sub-
mitted January 18, 1935. (Docket No. 142, Calendar
No. 38,248.) Decided April 9, 1935. Rehearing de-
nied May 17, 1935.

Assumpsit by Arnold Goss against the Kelvinator Corporation, a Michigan corporation, for sums due on a loan.  Judgment for defendant.  Plaintiff appeals.  Affirmed.

*James D. Williamson* and *Miller, Baldwin & Boos* (*Howard C. Baldwin* and *Frank H. Boos, Jr.,* of counsel), for plaintiff.

*Wiley, Streeter, Smith & Ford,* for defendant.

NORTH, J.  This is a suit in assumpsit by which plaintiff seeks recovery from defendant of $427,000 and accrued interest.  In a non-jury trial defendant had judgment and plaintiff has appealed.  In 1926 plaintiff was the president and director, also a member of the executive committee and of the financial committee, of the Electric Refrigeration Corporation, a holding company having as subsidiaries and holding all the stock of the Nizer Corporation, the Leonard Refrigerator Company, and Kelvinator Company.  In 1928 Electric Refrigeration Corporation by change of name became Kelvinator Corporation, the defendant herein.  In October, 1926, the defendant's treasurer and comptroller made a report showing defendant's earnings for the nine-months' period ending September 30, 1926, as being $2,764,921.02.  While this report was intended only as a tentative statement for those interested in the corporation, nonetheless it was at once made public and was printed in the Wall Street Journal and Detroit Free Press.  Defendant's stock was listed on the New York Stock Exchange and defendant maintained an office in Detroit.  The amount of the company's earnings for the specified period was in fact substantially $800,000 less than the reported

amount. Listing defendant's stock on the New York Exchange and also its general credit standing necessitated an audit and preparation of a statement or balance sheet by a certified public accountant covering the same period. For this purpose defendant employed a firm of certified public accountants, and it was these accountants who discovered the rather startling error in the previous report of defendant's earnings. The necessity for devising some plan by which defendant's affairs could be so shaped that the certified accountants could make an audit and balance sheet which would disclose defendant's earnings substantially as previously published was obvious to those in charge of the defendant company. If the discrepancy was disclosed defendant's stock on the exchange would be adversely affected, its standing with financial institutions would be jeopardized, and plaintiff, who practically had been in charge of defendant's affairs at a salary of $60,000 per year and who held about 100,000 shares or approximately one-sixth of the stock in defendant company would be subjected to severe criticism as well as financial loss. Defendant's board of directors met quarterly. During interim periods the board functioned through an executive committee of which, as noted, plaintiff was a member. An executive committee meeting was called at defendant's Detroit office for November 23, 1926. At this meeting and immediately preceding meetings of members of the executive committee and others interested serious consideration was given to effecting a solution of defendant's problem arising from the recently discovered error in the statement of its earnings. Means of accomplishing the desired result seemed to have been agreed upon, with the exception of two items totaling $427,000.

One of these items was a $258,000 loss sustained incident to establishing and operating sales agencies along lines which defendant asserts were adopted by plaintiff as the president of the company; but it may be here noted that plaintiff contends the method of establishing sales branches was in accordance with "the combined judgment of the operating committee." The other item was a discount of $169,000 which defendant claims plaintiff authorized on indebtedness of $1,000,000 owing to defendant company; but here again it may be noted that plaintiff asserts this was in accordance with the wish and understanding of defendant's board of directors or those in active charge of defendant's financial affairs. Regardless of the respective contentions just above noted, the record discloses that some of those attending the executive committee meeting on November 23d considered plaintiff primarily responsible for the two items above noted; and after much consideration plaintiff undertook to assume each of these items as his personal obligation and thus to relieve the defendant company. The minutes of the meeting, of which (with some possible slight modification) plaintiff had full knowledge and which he with other members of the executive committee adopted, record the action taken as follows:

"He (the plaintiff) stated that these expenditures (as to sales agencies) had never been authorized by the board of directors and the executive committee of the corporation or any of its subsidiaries and that in view of their large size the question had been raised by certain members of the board of directors as to his authority to take the action which he had in regard thereto in establishing branches on the scale on which he had. In view of this fact he stated that he would not seek to obtain from the board a

ratification of his acts in making these expenditures but would assume personal responsibility therefor and would reimburse the company through the proper subsidiaries in the aggregate of $258,000.
\* \* \*

"He stated that this specific settlement (the discount of $169,000) also had never been authorized by the board of directors or the executive committee of the corporation or any of its subsidiaries and that the question had been raised by certain members of the board of directors as to his authority to make the settlement in question. In view of this fact, he stated that he would not seek to obtain from the board a ratification of his act in making the settlement, but would assume personal responsibility therefor and would reimburse the company through the proper subsidiaries in the sum of $169,000 allowance made in the settlement.

"Mr. Goss further stated that in connection with both the above amounts, aggregating $427,000, he would be willing to pay the same as follows: \* \* \*

"It was thereupon moved, supported and unanimously carried that the offer of Mr. Goss to assume and pay to the corporation the amount of $427,000 in settlement of said aggregate amount of $427,000, be accepted."

Under date of November 29, 1926, plaintiff signed and delivered to defendant company the following:

"Gentlemen: In confirmation of the agreement which I made orally at the meeting of your executive committee held on November 23, 1926, and which agreement has been ratified by your board of directors at the meeting held on November 29, 1926, I hereby agree to reimburse you in the sum of $427,-000 with respect to the items and for the reasons set forth in the minutes of the executive committee, and I hand you herewith my promissory notes aggregating the above sum."

Except for a small discount allowed by defendant, plaintiff fulfilled the undertaking by paying his notes to defendant in the total sum of $427,000. This record discloses that beyond a doubt plaintiff's assumption of these liabilities totaling $427,000 was subject to a certain condition or understanding no record of which was included in the minutes recording the action of defendant's executive committee, its financial committee or its board of directors. At least there was such an understanding on the part of plaintiff and of certain of defendant's directors. The disagreement between these parties litigant as to the terms or conditions upon which plaintiff assumed these liabilities aggregating $427,000 has given rise to this lawsuit.

At the executive committee's meeting on November 23, 1926, and incident to plaintiff's assuming liability for the two items hereinbefore noted, there was an agreement or understanding, or at least some talk, that plaintiff would be given an option on stock in the defendant company from the exercise of which it was planned he should be reimbursed, at least partially, for his expenditures incident to taking over the two items aggregating $427,000. Obviously it was not possible to embody in the minutes of this meeting or elsewhere in defendant's records a plan or undertaking on the part of defendant to reimburse plaintiff for the loss incident to his undertaking without defeating the very purpose sought to be accomplished. Such a record would have disclosed or at least suggested a liability on the part of defendant corporation which would have offset and in effect cancelled the augmentation of its assets incident to receipt of plaintiff's notes aggregating $427,000. This would have rendered it impossible for the certified public accountants to have

made an audit and balance sheet showing earnings in substantially the same amount as published in defendant's previous report.

Plaintiff's claim is stated in his testimony thus:

"My position at that time was that if I did assume the liability for those items, I would do so only on condition that I be granted an opportunity through an option on stock by means of which I could recover through the market on the capital stock of the company, the amount I had advanced or would advance under the arrangement."

Before this suit was brought but after plaintiff's claim became a controversial matter, a so-called fact-finding committee was authorized by defendant's board of directors to investigate the facts surrounding plaintiff's claim and report thereon. After investigation such a report was made by defendant's secretary to its board of directors; and plaintiff in his brief quotes from the report as follows:

"At the time Mr. Goss made his offer to assume the liability in question, he stated that he would do so provided the corporation would give him an opportunity to reimburse himself by granting him the option on capital stock of the corporation, and. he suggested 10,000 shares at $45 per share. No action was taken by the board relative to the option until June 10, 1927, at a meeting of the board held in New York, at which time a committee was appointed to consider entering into an agreement with Mr. Goss to act as chairman of the board, and to include an option upon shares of the stock of the corporation. This option was finally entered into and executed December 29, 1927."

In brief it is plaintiff's claim that the condition of his taking over defendant's liabilities in the amount of $427,000 was that defendant agreed to insure him

against or to save him from any loss incident to such assumption by giving plaintiff an option on defendant's stock in such terms that by executing the option plaintiff would be reimbursed; and further that defendant did not perform its undertaking. On the other hand defendant contends that there were other and ample considerations along the lines hereinbefore noted as an inducement and consideration for plaintiff's undertaking; and that as to defendant there was no undertaking except that, as a sort of gentlemen's understanding, plaintiff was to have an option on defendant's stock on terms later agreed upon by the exercise of which plaintiff would undertake to reimburse himself or recoup the loss to which he otherwise would be subjected by his undertaking. Defendant contends that in accordance with this understanding plaintiff was given an option on 35,000 shares of its treasury stock at $20 per share until November 1, 1929; and that later further options were given or tendered to plaintiff. None of these options was exercised by plaintiff. As bearing upon the actual terms of the transaction giving rise to this controversy the following extract from plaintiff's letter dated May 20, 1929, addressed to defendant's secretary is enlightening and quite persuasive:

"As is well known to you and other directors who have been identified with the company since January, 1926, the option given to me on 35,000 shares of treasury stock at $20 per share, which option expires November 1, 1929, was actually granted not as a compensation for services or for the purpose of providing additional interest in earnings or success of the business, *but with the idea that it would be possible within the life of the option for me to market the stock at a figure which would give me an opportunity to recover, at least in part, the out and*

*out contribution of several hundred thousand dollars which I personally made for the protection of the company in 1926.''*

The record on appeal is voluminous; but we will quote from only one of the numerous witnesses as bearing upon defendant's contention that it at no time entered into an undertaking to reimburse plaintiff or insure him against loss incident to his undertaking of November 23, 1926. Mr. Albert G. Boesel, a witness for defendant, testified:

"As I recall now it was the sense of opinion of the directors, including myself, that if Mr. Goss could have an opportunity, without cost to the corporation, of being reimbursed for a gift, that everybody would be very happy to see such a denouement. * * * To the best of my memory on November 29, 1926, nobody said to me at the directors' meeting that Mr. Goss was to have an option guaranteeing to return to him $427,000.''

In quoting Mr. Boesel, we are mindful that he was not present at the executive committee meeting November 23, 1926; but he was present and participated in the special meeting of the board of directors November 29, 1926, at which the minutes of the executive committee meeting of November 23d were read and the action taken by the executive committee ratified and approved, and this matter was fully considered. Plaintiff was also present at this directors' meeting. In plaintiff's written communication addressed to the defendant company on the date of this board meeting and hereinbefore quoted, plaintiff stated that his oral agreement made November 23, 1926, at the meeting of the executive committee "has been ratified by your board of directors at the meeting held on November 29, 1926.''

From a careful review of this record on appeal we are satisfied that plaintiff is not entitled to recover. He is a capable business man of large experience. He was fully advised of and comprehended every detail of this transaction. He did not enter into it in consequence of any misrepresentation or fraud perpetrated upon him by defendant or its agents. His personal interest in surmounting the difficulties with which defendant company was confronted by reason of the false report of its earnings afforded ample consideration for plaintiff's assumption of the two items aggregating $427,000. Insofar as the transaction contemplated giving plaintiff an option, regardless of whether it was an obligation legally binding upon defendant or only binding in a moral sense, it was fully performed by defendant. As noted above, plaintiff was first given an option on 35,000 shares of treasury stock at $20 per share expiring November 1, 1929. It appears from the record that the option contemplated by plaintiff when the matter was first considered on November 23, 1926, was one at $40 or $45 per share. As bearing upon the terms of this option and plaintiff's prospects of utilizing it, the fact may be noted that only shortly before and on October 2, 1926, this stock was quoted at $60 per share. The price seems to have declined rather sharply and was quoted at approximately $35 per share on the day the executive committee met. Contrary to the expectation of plaintiff, and we think of all parties concerned, defendant's stock did not subsequently reach a figure at which plaintiff could reimburse himself for his $427,000 expenditure either under the terms of the option just above mentioned or the options subsequently given or tendered to him. The first option

expired November 1, 1929. On January 20, 1930, he was given a second option on 20,000 shares at $20 per share until December 31, 1930. On December 2, 1930, plaintiff by letter sought a further option and thereafter the board of directors tendered him a third option on 20,000 shares at $20 per share, the right to be exercised during November or December, 1931, and not otherwise. Plaintiff claims he did not accept this option because the minutes of the board incident to granting it contained the following recital: "The board unanimously stated that the granting of this request would be the final action of the board in connection with Mr. Goss' option and the transaction out of which it arose." In any event, like the previous options, this one was of no service to plaintiff because during November and December, 1931 (and for some months thereafter), the market price of the stock was not above $20 per share. It does not appear from the record in this case that plaintiff's failure or inability to reimburse himself for the $427,000 which he assumed in behalf of the company was due in any way to a failure on the part of defendant to grant him an option or options in accordance with the oral understanding originating November 23, 1926. Instead, failure of accomplishing the desired results by the means devised was due to the fact that the market price of the stock at no time exceeded the option price by a sufficient margin.

In arriving at the above conclusion we have not overlooked plaintiff's complaint that during the period, or at least a part of the period, that his options were in force defendant gave certain options to others parties and at least in some instances on more favorable terms. The testimony does not disclose that the granting of these other options was

the cause of the continued low price of defendant's stock and therefore produced the condition which prevented plaintiff from reimbursing himself in the manner devised. Further, the granting of these other options, at least in part, was approved by plaintiff as a member of defendant's board of directors. At the trial of the case the court asked plaintiff:

"*Q.* Did you consent to any of those other options? * * *

"*A.* I believe I did.

"*Q.* Why did you do so, if you knew it had the purpose to defeat your own option?

"*A.* Well, the most I could have done would have been to have refused to vote on them, and I was already being accused of a lack of cooperation with the company and the board. I should say that these other options were both given for the purpose of defeating my option and for the purpose of enabling the company to get funds."

While opposition by plaintiff might have been futile, his present contention would be much more appealing if he had opposed granting the other options instead of acquiescing therein.

Plaintiff's present contention that defendant actually contracted to save him from loss by means of an option on its unissued treasury stock places him in an unfavorable and somewhat inconsistent position. In his brief he says:

"The evidence is uncontradicted that the purpose of creating this liability (of plaintiff to defendant on his notes) was to increase the profits by $427,000 and to make the Ernst & Ernst (the certified public accountants) statement reflect approximately the same profit as that reflected by the tentative statement of the comptroller."

Clearly the result would not have been "to increase the profits by $427,000" if defendant simultaneously became legally bound to reimburse plaintiff for a like amount. All parties concerned were fully aware of this; and we think the actual situation, at least from a practical standpoint, is not at all altered by plaintiff's rather technical contention now made: that an option on defendant's stock did not constitute a liability. Even so, clearly an undertaking by defendant to "reimburse" plaintiff would have been a liability. If plaintiff's present contention is correct, the scheme devised to insure him against loss was such as to render the resulting financial statement of the certified public accountants a fraudulent misrepresentation, and one in which both plaintiff and the other directors of defendant company participated. Such a conclusion should not be reached unless established by cogent proof; and we think the record on this appeal does not sustain such a conclusion.

Appellant stresses the assertion that prior to his assumption of the items totaling $427,000 he was not legally bound to pay this amount in behalf of the defendant. Even so, we think this is not at all controlling. If, as plaintiff stated in his letter of May 20, 1929, addressed to defendant's secretary, the $427,000 was an "out and out contribution * * * which I personally made for the protection of the company in 1926," it would seem that legally no consideration was necessary. However, in defendant's accounts the $427,000 was not treated as a gift which, as a matter of bookkeeping, would have resulted in increasing its surplus instead of its earnings or profits. The latter result was desired and accountants treated the item accordingly. But aside from the foregoing, the controlling fact is that

plaintiff did assume and pay the items and in consideration he received the options above noted. Plaintiff assumed these liabilities because of his personal responsibility for the loss or expenditure of the $427,000, because of his interest in the financial standing of defendant company, and because of his extensive stockholdings therein, all of which afforded a consideration for his undertaking. That these circumstances just noted constituted the inducement or consideration in consequence of which plaintiff assumed $427,000 of defendant's liabilities is indicated by a statement from plaintiff to defendant's executive committee written as late as January, 1932. Referring to discussions between the interested parties which occurred about the time the transaction was consummated, plaintiff stated:

"Extended discussions of the situation were had by the full board together with Messrs. Ernst and Bailey of Ernst & Ernst. From these discussions I was given to understand that the showing for the period as published in the statements could not be reconciled with the results of the audit, *which would get the company into difficulty with the New York Stock Exchange and its banks,* unless some way was provided by the board or by some of its members to place the amount of these differences at the disposal of the company.

"*The standing of our newly-formed company was at stake with our banks, our stockholders and with the New York Stock Exchange. At that time, I was the largest individual stockholder and probably had the most pride in its success and the most confidence in the organization and its future business possibilities.*"

In this connection it may be noted, quoting again from plaintiff's written statement addressed to defendant company November 29, 1926, he said: "I

hereby agree to reimburse you in the sum of $427,000 with respect to the items *and for the reasons set forth in the minutes of said executive committee;"* which minutes are hereinbefore quoted.

As to sufficiency of consideration see: *Prudential Trust Co.* v. *Moore,* 245 Mass. 311 (139 N. E. 645); *International Trust Co.* v. *Wattendorf,* 256 Mass. 323 (152 N. E. 306); *American Trades & Savings Bank* v. *Duhring,* 191 Cal. 788 (218 Pac. 401).

It seems unnecessary to add to the length of this opinion by detailing that in computing and paying the government his income tax plaintiff charged the items which he now seeks to recover as losses, thereby reducing the amount of his tax. Further review of this record would be of no service. It discloses that defendant, not plaintiff, is correct in the contention made as to the terms and conditions under which plaintiff assumed defendant's liabilities in the amount of $427,000. As hereinbefore stated plaintiff was not induced to enter into or consummate this transaction by any fraud or deceit on the part of defendant or its agents. There was ample consideration. And insofar as the transaction imposed upon defendant company an obligation to give plaintiff an option upon its unissued treasury stock, defendant fully performed.

The judgment entered in the circuit court is affirmed.

POTTER, C. J., and NELSON SHARPE, FEAD, WIEST, BUTZEL, BUSHNELL, and EDWARD M. SHARPE, JJ., concurred.