## First National Bank of Bangor, to use, Appellant, v. Beck.

Argued December 3, 1936.   Before KEPHART, C. J., SCHAFFER, MAXEY, DREW, LINN, STERN and BARNES, JJ.

*Calvin F. Smith,* with him *Woodley & Davis,* for appellant.

*David B. Skillman,* with him *T. McKeen Chidsey,* for appellee.

OPINION BY MR. JUSTICE LINN, January 11, 1937:

This is a suit against the maker of a promissory note; liability is denied on the ground that the note was delivered conditionally and the condition was not fulfilled, or, as we consider it, that there was failure of consideration. The note was given to The First National Bank of Bangor, the legal plaintiff, for convenience hereafter referred to as the old bank, and passed by assignment to the use plaintiff, First National Bank in Bangor, called the new bank.

In 1931, the Comptroller of the Currency discovered that the capital of the old bank was seriously impaired and notified the directors that it must be made good. The alternative was liquidation. The directors considered the problem, and finally evolved a plan intended to save the bank by contributions to be made by certain directors and stockholders. The plan was not carried out in its entirety because some who were supposed to contribute defaulted.

Defendant became a director in the fall of 1931. The president shortly afterward informed him that "we had

certain securities that were not good and if not taken up the capital of the bank would be impaired"; later, at a board meeting held January 26, 1932, the president said that "if the different members of the board and certain stockholders took out notes to the amount of $9,000 each the impairment of the Bank's capital and the impairment of the Bank's stock would be avoided. Q. What did you say in answer to what Mr. Abel [president] said? A. I said if the rest do I will; . . ." It was also testified that he said "I'll go along for $9,000. . . ."

On March 22, 1932, an agreement was signed by eleven out of fifteen of the parties, who, defendant understood, would sign it. The purpose was to agree upon a plan and provide for restoring the capital. Paragraph 1 provides that each party "being owner of certain securities, does hereby assign, transfer, and set over those securities unto Asher G. Abel, Trustee" upon a trust stated in the agreement. These securities, as we understand the record, were the old bank's property which the Comptroller or his representative had determined to be insufficient as capital investments. A list describing them was made part of the agreement. To make the transfer possible, we understand (though the record leaves this to implication) that these securities became or were treated as the property of the parties to the contract of March 22nd, becoming part of the consideration moving from the bank for the obligations to be assumed by the participating directors to carry out the plan. Other provisions need not now be stated. The next day defendant gave his note for $9,000 payable to the order of the old bank. At various times thereafter, others (though not all) gave notes, and, in some cases, for less than the $9,000 preliminarily agreed upon. These notes were discounted by the old bank;[1] it gave

---

[1] At a meeting of the board of directors on March 29, 1932, at which the defendant was present, it was resolved that the notes of nine of the directors, each for $9,000, be discounted and the pro-

consideration by discounting them, and also by transferring the questioned capital investment; the maker's account was credited with the proceeds and he immediately drew his own check for the same amount to the order of the bank or of Abel, as trustee. The agreement provided that each contributor should receive from the trustee a certificate of participation showing his interest in the "pooled" assets, as they are termed in the brief. Such certificates were issued and were also assigned to the bank as collateral. In this way the bank was put in funds for capital reserve account and if all had made their notes the amount contributed would have been $135,000. Instead, the total amount of notes received and discounted was $88,800. The bank continued until it was closed pursuant to the President's Proclamation, March 4, 1933. It opened later on a restricted basis with Abel, who had been president, as conservator. He acted in that capacity until the old bank's assets, or such of them as were desired, were sold to the new bank organized in May, 1934. Defendant remained a director of the old bank until it closed, attended meetings and participated in the conduct of its business.

As director and stockholder, defendant stood to lose by the liquidation of the bank. He was therefore interested in having as many as possible of the other directors and stockholders contribute to restore the capital. His real grievance is that the refusal of some resulted in a smaller total contribution than would have been made if all had contributed as he expected. For present purposes, we may assume that as to him there was failure of consideration, though much may be said against the assumption. It is also unnecessary to deal with the parol evidence rule discussed by counsel. We all think

---

ceeds credited subject to reserve requirements. Although Beck's note had in fact been discounted March 23, the resolution included it with the others. Nothing in the minutes indicates that the notes were to be given subject to any condition such as defendant asserted in defense.

that defendant is estopped by his conduct from March 22, 1932, to May 1, 1934, from now asserting the defense of failure of consideration, or any other suggested on his behalf. The evidence of this estoppel appears in his own testimony and in the admitted documentary evidence. To this we shall now refer in the order in which the events occurred.

(a) From time to time after the date of the agreement, March 22, 1932, Abel, the trustee, credited defendant's account in the bank with credits due to him, at the specified proportional rate on which the trustee realized from the pooled assets. As late as April, 1934, defendant drew his own check in payment of interest on the note.

(b) On March 29, 1932, defendant, with others, signed a letter, the result of discussion at a directors' meeting, to the Deputy Comptroller of the Currency stating that "To date various directors of this institution have paid into a special fund for the purpose of eliminating from the Bank certain defaulted securities, the sum of $63,000. It is planned to increase this fund to approximately $120,000 in the near future and use this fund for the purpose of purchasing from the bank certain securities now in default and certain securities which show a decided depreciation in market value. To date securities of this nature carried on our books at $43,072.50 have been entirely eliminated from the Bank's bond account." The letter, after stating how it was proposed to deal with the situation, continues: "We shall be pleased to have your reaction on this policy as stated in the preceding paragraphs of this letter and beg to renew our previous promises—that we shall use our best endeavors to place the Bank in a position that will merit the approval of your Department." Defendant was present at the board meeting and testified that when he signed the letter he knew "exactly how many people had given notes," and that "not all the people mentioned in the caption of the agreement" had given notes,

and that the letter was written "for the purpose of showing to him [the Comptroller] that $63,000 of notes had been given." Not a word did defendant say to the Comptroller that would indicate that his note was not intended to be the absolute obligation it purported to be by its written terms. The minutes of the board reciting the discount of defendant's and other directors' notes without condition, were approved at subsequent meetings in which defendant participated.

(c) On May 31, 1932, defendant was appointed a member of a director's committee to examine the bank's condition and to report the same pursuant to the requirements of the federal law.[2] Section 5211 of the Revised Statutes as amended, 12 USCA 161, contains the following: "Each such report shall exhibit, in detail and under appropriate heads, the resources and liabilities of the association at the close of business on any past day by him [the Comptroller] specified. . . ." Beck was present during the examination; no information was refused to him; he signed a report including among the assets his note as well as the other notes discounted to carry out the plan. Asked why he did that, if the report did not represent the fact as respects his note, he said: "I, not knowing anything about banking, just went along with the rest. . . . Well, I stood back and looked on." Asked whether he read the report he replied: "Surely, about as much as the rest of them did." This examination of the condition of the bank occupied the time from May 31 to June 2 and gave opportunity for complete knowledge of the status of the transaction in which the note was given.[3] Asked about

---

[2] R.S. section 5211 as amended, 12 USCA 161.

[3] The report of the Committee contains the following: "The collateral held by the Bank as security on the various notes was verified and found to be correct with the records of the collateral ledger. Stock certificates were examined as to assignment and powers of attorney and found to be complete. All mortgage loans were checked as to the amount of fire insurance pledged with the

performing his statutory duty as a member of the committee he said, ". . . it was sadly neglected. . . . I being a 'green horn' at that kind of business I didn't go into detail with it." He was asked, "Q. Still you were inviting deposits of people such as the laborers, the servant girls and the people in and about Bangor, upon that kind of performance of duty, weren't you? A. Yes, sir."

(d) On December 31, 1932, he again signed and swore to the accuracy of another such report.

(e) On a date in February or on March 4, 1933, defendant, with others, signed a statement certifying that an account prepared by Abel, as trustee, was correct and releasing him from further liability as trustee under the agreement of March 22, 1932. This, too, he says he did without knowing the effect of what he signed, though he would have learned, if he had examined the record of the transaction, that some of those that he thought would sign the agreement had never done so, and had given no notes and that others had given notes in amounts less than $9,000.

The Comptroller of the Currency was not informed that defendant's contribution to the restoration of the reserve was not an absolute obligation as it appeared to be. It was the Comptroller whom defendant and his associates were asking to stay liquidation of their bank upon the faith of their contributions. The law required the Comptroller to liquidate the bank unless the capital was made good. If they had not contributed, the bank would have been liquidated long before it was. The

---

mortgages and the note proof of the last trial balance was verified and found to be correct in accordance with the general ledger. The securities owned by the Bank were verified by examining those on hand with the receipts held by the Bank from our City Correspondents. The securities held by the Bank for safe-keeping and against which our customers held receipts were verified and found to be correct. The balance of various corresponding banks were checked and verified with the reconcilement ledger and found to be correct. The past due notes, as well as the notes in the process of collection were reviewed and verified."

Comptroller acted on the representations made to him. We are not dealing with a transaction between contributing and non-contributing parties alone;[4] their negotiations among themselves as directors and stockholders were mere preliminaries to the accomplishment of the object for which all were working; it was to comply with the law that the impaired capital had been restored. No conditions they might wish to impose on each other during those negotiations could encumber their contributions without notice to and assent by the Comptroller who was administering the law. It is immaterial, in this suit, that the president of the bank knew, as defendant testified, that before executing the note and the contract, defendant said he would contribute if the others did. In the circumstances, the president of the bank had no authority to accept anything less than defendant's absolute obligation *(Bangor Trust Co. v. Christine,* 297 Pa. 64, 146 A. 545) and the minutes of the board at which the discount was authorized show nothing less. The effect, of course, is that the old bank, the legal plaintiff, held the note free from the defense interposed: *Bangor Trust Co. v. Christine,* 297 Pa. 64, and cases cited page 67, 146 A. 545. The new bank, the use plaintiff, in purchasing it with other assets of the old bank, likewise received by assignment an absolute obligation and is therefore also entitled to enforce payment.

Referring back now to the reports to the Comptroller attested by defendant (paragraphs (c) and (d) above) it will be noted that if defendant's note was not then good, for the reason he now gives, the reports signed by him were false. Damages sustained in consequence of false report of the condition of a National Bank may be recovered in an action of tort: *Thomas v. Taylor,*[5] 224

---

[4] Which distinguishes *Riday's Estate,* 317 Pa. 529, 177 A. 812, cited on defendant's behalf.

[5] In connection with the quotations from the defendant's testimony describing what he did or omitted to do in ascertaining the

U. S. 73; *Jones National Bank v. Yates,* 240 U. S. 541.

The Act of September 26, 1918, R.S. section 5209, c. 177, section 7, 40 Stat. 972, 12 USCA 592, makes it a misdemeanor for a director "with intent in any case . . . to deceive . . . the Comptroller of the Currency . . ." to make false entries in a report of the condition of the bank. As the report required a statement "in detail under appropriate heads, [of] the resources . . ." we assume (the report is not printed in full in the record) that defendant's note was carried as the asset that it purports to be; if, as defendant now says, he was not liable on it, the report was false: see *U. S. v. Adams,* 281 U. S. 202, 204; *Hargreaves v. U. S.,* (C.C.A. 9th) 75 F. (2d) 68, 71.

Defendant joined in representing to the Comptroller that certain facts existed; the representation was made to obtain his approval of the restoration of capital and allowing the bank to continue. The report as published made the same misrepresentation to the public. The Comptroller, unadvised of the condition upon which the defense is now based, adopted defendant's statement or representation of facts as unconditional and permitted the defendant and his associates to continue operating

---

truth of the reports attested by him, the following quotation from *Thomas v. Taylor,* supra, may be pertinent: "There is 'in effect' an intentional violation of a statute when one deliberately refuses to examine that which it is his duty to examine. And such was the conduct of plaintiffs in error in this case. They had notice from the Comptroller of the Currency that $194,000 of the items counted as assets of the bank were doubtful and should be collected or charged off. This 'was a direct warning to them,' as the trial court said, 'by the bank examiner and Comptroller that assets to nearly twice the amount of the capital stock were considered doubtful.' They, notwithstanding, represented the assets to be good. Such disregard of the direction of the officers appointed by the law to examine the affairs of the bank is a violation of the law. Their directions must be observed. Their function and authority cannot be preserved otherwise and be exercised to save the banks from disaster and the public who deal with them and support them from deception."

the bank. Having made such representation of facts, obtained action on the faith of their existence, the principles of estoppel prohibit the defendant from now saying that the facts were not as he represented them to be: *State Bank of Pittsburg v. Kirk,* 216 Pa. 452, 65 A. 932; *Prudential Trust Co. v. Moore,* 245 Mass. 311, 139 N. E. 645. See *Warren National Bank v. Jamieson,* 301 Pa. 45, 151 A. 672; *Bangor Trust Co. v. Christine,* 297 Pa. 64, 146 A. 545; *First National Bank of Hooversville v. Sagerson,* 283 Pa. 406, 129 A. 333; *Lyons v. Benney,* 230 Pa. 117, 79 A. 250; *People's Bank of Calif. v. Stroud,* 223 Pa. 33, 72 A. 341.

Plaintiff's point for binding instructions should have been affirmed. The judgment is reversed and the record is remitted for the entry of judgment for the amount due with interest.