(No. 26149.—

THE CENTRAL REPUBLIC TRUST COMPANY, Appellee, *vs.*
PETER L. EVANS *et al.* Appellants.

*Opinion filed Sept. 15, 1941—Rehearing denied November 18, 1941.*

KIRKLAND, FLEMING, GREEN, MARTIN & ELLIS, HEALY & REID, EUGENE E. DORNBAUGH, JONES, MULROY & STAUB, and DEFREES, BUCKINGHAM, FISKE & O'BRIEN, (JOSEPH B. FLEMING, WILLIAM H. SYMMES, JOHN M. O'CONNOR, JR., DANIEL M. HEALY, DON KENNETH JONES, JOHN MERRILL BAKER, JAY FRED REEVE, and ELBRIDGE W. RICE, of counsel,) for appellants.

FRANK MICHELS, LEE WALKER, and R. A. BULLINGER, for appellee.

Mr. JUSTICE GUNN delivered the opinion of the court:

The action in this case was at law on a promissory note dated August 12, 1930, for the sum of $210,000. It was made payable to the National Bank of the Republic of

Chicago; the makers were the appellants in this case; the note was later assigned to the Chicago Trust Company, a banking corporation, and by the latter to the Central Bank and Trust Company, the name of which was later changed to the Central Republic Trust Company. On February 7, 1933, judgment was entered in the circuit court of Cook county by confession for $245,811.25, and on February 13, 1933, defendants' motion to open the judgment and permit them to plead on the merits, with the judgment to stand as security, was allowed. On February 24, 1933, the judgment was assigned to the Reconstruction Finance Corporation as beneficial plaintiff, who was pledgee of substantially all of the assets of the Central Republic Trust Company. Pleas were filed by defendants and issue joined thereon and trial was had before a jury. At the close of the evidence both plaintiff and defendants moved for directed verdicts; the motion of plaintiff was denied, and the motion of the defendants allowed and judgment entered upon the verdict. On appeal to the Appellate Court for the First District the judgment of the circuit court of Cook county was reversed and the judgment by confession in favor of the plaintiff was confirmed. A petition for leave to appeal to this court has been allowed.

The pleas filed by the defendants were: (1) That they did not promise; (2) that they did not deliver the note sued upon; (3) that the note was not made and executed and delivered for the purpose of becoming a binding obligation, but was, in fact, a matter of form made for the purpose of causing the financial statement of the Madison Square State Bank to appear to be in a more liquid condition than was justified by the actual facts; (4) that there was no consideration in that the note was executed for the accommodation of the National Bank of the Republic; that defendants did not receive the money, and that assignees of said note had knowledge of such facts and were not holders in due course; (5) an additional plea to the effect

that the note was given in pursuance of an illegal transaction consisting of a conspiracy of the payee and its officers and others which would assist the National Republic Bancorporation to engage in the illegal business of branch banking.

The ultimate facts in issue are almost concealed by the extended statements of fact, the number of corporate reorganizations involved, and the numerous instances in which such corporations had directors in common. A full and complete statement of the pleadings and facts is to be found in the opinion of the Appellate Court. 307 Ill. App. 605.

The ultimate facts requiring consideration are substantially as follows: On August 11, 1930, the note in question payable to the National Bank of the Republic was signed by part of the defendants, and by September 3, 1930, by the remainder. The note, when signed, was delivered to the National Bank of the Republic and a cashier's check was issued payable to the defendants; the loan was approved by the vice-president of the bank, and each of the defendants delivered to the National Bank of the Republic statements of their financial condition, purporting to be for the purpose of borrowing money and procuring credit. By September 29, 1930, the cashier's check was endorsed by the defendants and deposited in the National Bank of the Republic to the account of the Madison Square State Bank. In 1931, the stock of the National Bank of the Republic was acquired by the Chicago Trust Company, which said last mentioned company and the Central Trust Company later merged under the name of the Central Republic Bank and Trust Company, the name of which was later changed as pointed out above; in June, 1932, the Reconstruction Finance Corporation loaned the Central Republic Trust Company $90,000,000, and the note in question, together with other securities, was pledged to secure this loan.

The corporate connections involved are as follows: In 1929, the National Republic Investment Trust was organized under the laws of Illinois for the purpose of dealing in stocks, bonds, and securities; eight officers of the National Bank of the Republic became trustees; they purchased 150,000 shares in the National Republic Investment Trust, and to pay for the same borrowed of the National Bank of the Republic $833,500. The National Republic Bancorporation (hereafter referred to as Banco) was organized in 1930 under the laws of Illinois with an authorized capital stock of $20,000,000, as an investment trust for dealing in stocks, bonds, securities, etc. The by-laws provided that its managing committee should consist of its officers and one member from each bank of whose stock it had obtained control. Three directors of the National Bank of the Republic, viz., George Woodruff, John A. Lynch, and John W. O'Leary, signed the statement applying for incorporation. The National Republic Investment Trust purchased 84,974 shares of Banco by exchanging therefor 10,000 shares it owned in the National Bank of the Republic; stock of six other banks in Chicago and vicinity was traded by the owners for Banco stock in varying ratios, depending upon the condition of the respective banks, until the former stockholders of such banks owned 482,331 shares of Banco stock, while Banco owned sufficient stock to control the several banks through its ability to elect directors at stockholders' meetings.

The relevancy of these proceedings, as claimed by appellants as affecting liability upon the note, is as follows: Banco was negotiating with the directors of the Madison Square State Bank to exchange Banco stock for stock in the bank; on August 11, 1930, the directors of the Madison Square State Bank individually entered into a written agreement with Banco to change the capital structure of the bank; under such agreement the number of shares would be reduced from 3000 to 2000, so the capital would

be $200,000 instead of $300,000; the surplus would be reduced $50,000 and the undivided profits reduced $50,000, and assets from said bank, representing the reduced capital and surplus and reduced undivided profits would be placed in trust to indemnify the bank from any loss in retained assets and to guarantee dividends on the stock of the Madison Square Safe Deposit Company, which was owned by said bank. Appellants also agreed to buy the stock of the Madison Square Safe Deposit Company from the Madison Square State Bank for the sum of $210,000; said stock was to be placed in trust, to be used with the other trusteed assets representing reduced capital and surplus, to keep said bank in good condition, and at the end of five years, if not sold sooner, was to be distributed 1/11 to each of said defendants (signers of said note). The agreement also provided that the Madison Square Safe Deposit Company, which owned the building in which the Madison Square State Bank operated, should receive rent for the use of the building at the rate of $15,000 per year, which should be increased at stated intervals depending upon the increase in business done by the Bank. These individuals also agreed that if the suggested changes were ratified by a stockholders' meeting, 1001 shares of stock in the Madison Square State Bank would be exchanged for 6006 shares of stock in Banco. The $210,000 proceeds of the note, paid out by the National Bank of the Republic, was placed to the credit of the Madison Square State Bank as pointed out above, and the provisions of the contract relative to trusteeing the impaired assets, and the stock of the Madison Square Safe Deposit Company were carried out.

The National Bank and Trust Company did not, as a corporation, participate or take part in any of these proceedings or transactions, but it is claimed that it was a participant through the action of George Woodruff, chairman of the board of the National Bank of the Republic, and some of the other defendants who were connected with it

in an official way. Woodruff was the chairman of the board; Lynch was chairman of the executive committee; O'Leary was the president of the bank; Charles S. Castle was vice-chairman of the executive committee; H. E. Otte was vice-chairman of the bank; Lucius Teter was vice-chairman of the bank; Ward C. Castle was vice-chairman of the executive committee of the bank, and they were also officers of the Chicago Trust Company. These individuals, together with David R. Forgan, caused to be organized the National Republic Investment Trust above mentioned. Five of these individuals, viz., Woodruff, Lynch, O'Leary, Otte and Ward C. Castle, signed the statement of incorporation for creating Banco. When organized, Woodruff became chairman of the board, and Ward C. Castle, secretary, of Banco; the president, vice-president, and treasurer, so far as the record shows, were not officers of the National Bank of the Republic.

The signers of the note were all men of extensive experience in banking and other business; appellants Cunningham, Thorpe, Reese, Georgs and Schiewe were all connected with banks; Sellen and O'Keefe were prominent business men, and Cheney and Evans were lawyers experienced in banking. It is claimed that Woodruff made certain oral representations and statements before the note was signed, to the effect that the defendants would not be liable for the payment thereof, and that he and the National Bank of the Republic and Banco would at a future time cause the Madison Square State Bank to repurchase the stock of the Madison Square Safe Deposit Company, and that the note would be paid out of the proceeds, and that the National Bank of the Republic would only look to the proceeds of such repurchase for the payment of the note. The evidence upon this is conflicting. Woodruff did not testify, but an affidavit of counsel of one of the defendants to the effect that he would so testify appears in the record. Other

defendants present at the time the matter was discussed testified differently, and some did not testify at all.

It is also claimed that the alleged unlawful conspiracy to put Banco in control of a number of banks so as to effect branch banking was originated and carried out by the National Bank of the Republic. There is no resolution of the board of directors of the bank to such effect in the record, nor is there any resolution authorizing Woodruff to act upon behalf of such bank. The number of directors of the National Bank of the Republic does not appear. The conclusion that there was a conspiracy is reached because certain of the officers and directors of the National Bank of the Republic were prominent in the organization of the National Republic Investment Trust and in Banco. It does not, however, appear that such officers were all of the directors, or acted as a majority of the directors. So far as the pleading is concerned the inference is drawn principally from the fact that they were officers of the bank.

Appellants argue only the issues raised under the third, fourth and fifth pleas, and, therefore, we assume that the issues under the first two pleas are waived. The third plea was to the effect that Woodruff, the chairman of the board of directors of the National Bank of the Republic, prior to the time the note was signed, assured certain of the defendants that the arrangement was such that they would appear to own the stock of the Madison Square Safe Deposit Company, and that the National Bank of the Republic would supply the money, and defendants sign and deliver the note as a matter of form, upon which they would not be liable, and that Woodruff and the bank and Banco would, at a future time, cause the Madison Square State Bank to repurchase the stock.

Assuming that Woodruff did so state, concerning which there is a dispute, no authority from the directors of his bank to make such an agreement has been shown, and

neither does it appear that any resolution was ever adopted by the National Bank of the Republic vesting the chairman of the board with such authority. The president of a bank has no authority to bind it except in the discharge of his ordinary duties, and it is not one of his ordinary duties, nor a power inherent in his office, to release debtors of the bank from the payment of their obligations without a consideration. This principle has been applied in holding that an executive officer of the bank has no implied authority to bind it by a promise that one who signs a note shall not be required to pay it. (*Bank* v. *Dunn,* 6 Peters 51, 8 L. ed. 316; *United States* v. *City Bank,* 21 How. 356, 16 L. ed. 130; *Bank of Dexter* v. *Simmons,* 204 S. W. (Mo.) 837; *Culpepper Nat. Bank* v. *Walsh,* 114 Va. 522, 77 S. E. 484; *Prudential Trust Co.* v. *Moore,* 245 Mass. 311, 139 N. E. 645; *Pelonsky* v. *Wattendorf,* 255 id. 558, 152 N. E. 337; *Warren Savings Bank* v. *Foley,* 294 Penn. 176, 144 Atl. 84; *Geneva Nat. Bank* v. *O'Brien,* 200 N. Y. S. 785—affirmed 209 App. Div. 846; *German-American State Bank* v. *Watson,* 99 Kas. 686, 163 Pac. 637. The principle is applicable to the chairman of the board of directors. *Knass* v. *Madison and Kedzie Bank,* 354 Ill. 554, even goes further, because it was there held that, assuming a bank had properly authorized its officers, it could not make an agreement to repurchase mortgage bonds at a guaranteed price where title had passed absolutely to the purchaser.

The question does not seem to have been directly passed upon by this court, but the transaction is so foreign to the ordinary business of a bank, and would vest in the executive officers such power to deplete its assets that express authority to make such a contract would be invalid under *Knass* v. *Madison and Kedzie Bank, supra.* This plea did not, as a matter of law, state a defense to the note executed by the defendants.

The fourth plea alleges that the National Bank of the Republic was a party accommodated by the note given by the defendants, and that it was without consideration and, therefore, invalid in the hands of the subsequent parties, who were alleged to have notice of the facts. In the first place the National Bank of the Republic could not be the accommodated party; it was the one which advanced the money upon the note of the defendants. Under such circumstances as are claimed in this case the accommodated party, if any one, would have been the Madison Square State Bank. The definition of an accommodation party contained in the Negotiable Instrument act negatives this contention. It is there said: "An accommodation party is one who has signed the instrument as maker, drawer, acceptor, or endorser, for the purpose of lending his name to some other person." Ill. Rev. Stat. 1939, chap. 98, par. 49.

Where a note is given to a bank and the money procured on such note is applied to the credit of some other person, or is used to make a previous loan legal, which is otherwise excessive, such other person is the accommodated party. *Tanners Nat. Bank* v. *Dean*, 283 Mass. 151, 186 N. E. 219; *Schwenker* v. *Teasdale*, 206 Wis. 275, 239 N. W. 434; *Citizens' State Bank* v. *Vohs*, 184 Minn. 506, 239 N. W. 249; *West Rutland Trust Co.* v. *Houston*, 104 Vt. 204, 158 Atl. 69; *German-American State Bank* v. *Watson, supra; Comr. of Banks* v. *Cincotta*, 293 Mass. 272, 199 N. E. 910.

But aside from these reasons there was a valid consideration for the said note. The defendants, or some of them at least, were interested in the Madison Square State Bank. For reasons that seemed advisable, whether at the request of Banco, or based upon their own judgment, they determined to make the bank more liquid. This required taking out assets and putting in money. Appellants re-

ceived the money from the National Bank of the Republic and paid it to Madison Square State Bank. It has been repeatedly held that notes signed by stockholders to keep a bank going, or making a voluntary assessment, or to strengthen the credit of the corporation, or to preserve its solvency, rest on good consideration. (*Andrew* v. *Shimerda,* 218 Iowa, 27, 253 N. W. 845; *Continental Nat. Bank* v. *Dowle,* 55 Cal. App. 405, 203 Pac. 780; *Farmers Cooperative Union* v. *Reynolds,* 127 Kas. 16, 272 Pac. 108; *Tyler* v. *Reynolds,* 197 S. E. (W. Va.) 735; *Merchants & Farmers Bank* v. *Cardwell,* 127 S. W. (2) (Tenn.) 113; *Tegtmeyer* v. *Nordlund,* 259 Ill. App. 247; *Hinsdale State Bank* v. *Lytle,* 262 id. 151; *Scott* v. *Venice State Bank,* 262 id. 502; *National Bank of the Republic* v. *Schmidt,* 268 id. 287.) The facts adduced by appellants disclose that parties interested in the Madison Square State Bank took doubtful assets out, paid cash for certain valuable assets, and delivered the money borrowed of appellees to a bank in which they were interested, which not only enhanced the value of the stock, but also placed it in shape where it could possibly repay the advances out of earnings or recoveries. There was no evidence in the record to sustain the contention that the National Bank of the Republic was the accommodated party under the fourth plea, nor that there was a lack of consideration for the note in controversy.

This leaves for consideration the questions raised by the additional plea, which charges the money was loaned to aid in carrying out a contract in violation of the public policy of the United States and of the State of Illinois, which would defeat collection of the money borrowed by the defendants and placed to the credit of the Madison Square State Bank. It is not contended the National Bank of the Republic, by any authorized action of its directors, engaged in any illegal act, nor is it claimed that it did not have authority to make the loan to the defendants.

It is asserted the National Bank of the Republic controlled Banco, but the record is barren of proof of this claim, except in so far as some officers or directors of the National Bank of the Republic are officers or directors or trustees of Banco. There is no proof that the National Bank of the Republic owned any stock in Banco, but rather the proof shows Banco's stock is largely held by former stockholders of the small banks, and that among Banco's trustees were representatives of each of these banks. Neither is there proof that the National Bank of the Republic was the holder of stock, or otherwise interested in the Madison Square State Bank. There is no claim it was not legal to loan money to the directors of the latter bank to enable them to make it more liquid. The necessary foundation of appellants' claim of illegality must be based upon the following sequence of events: (1) Some of the directors of the National Bank of the Republic signed the statement of incorporation of Banco; (2) Banco acquired bank stock in the several small banks, giving it power to dominate the board of directors therein; (3) Banco desired control of the Madison Square State Bank if it could be made liquid; (4) the directors and stockholders of the Madison Square State Bank were agreeable to making it liquid and exchanging stock; (5) they borrowed the money of the National Bank of the Republic for this purpose; (6) Banco, the Madison Square State Bank and the National Bank of the Republic had certain officers in common. These are the material facts to be gleaned from the record to establish the conclusions contained in the plea; viz., that the National Bank of the Republic conspired to do an illegal act; that it controlled Banco; that it was engaged in branch banking; and that it, by a loan, enabled Banco to acquire control of the Madison Square State Bank.

It is beside the question to determine whether Banco, as a business corporation, could acquire bank stock, and

by the control exercised thereby be considered as engaging in branch banking. The charge in the pleas is that the National Bank of the Republic was so doing, or conspired to so do. Where no official act of the bank is shown, and no proof of the number of its directors or those under alleged control, or authority given by them to the chairman to act in their place, it would be beyond the powers of the latter to bind the National Bank of the Republic under the authorities above cited.

If it be assumed that the purpose of Banco in acquiring control of a number of banks was illegal, this, in itself, does not, under well-known principles, prevent recovery upon the note from appellants. By the weight of authority, in order to prevent recovery upon the ground of illegality the connection of the plaintiff with the illegal transaction must be direct—not remote. It has frequently been held that mere knowledge of a borrower's illegal purpose will not deprive the lender of his right to recover money loaned. *Hoefeld* v. *Ozello,* 290 Ill. 147; *Graves* v. *Johnson,* 179 Mass. 53, 60 N. E. 383; *Hines* v. *Union Savings Bank,* 120 Ga. 711, 48 S. E. 120; *Johnson* v. *Toltec Ranch Co.* 174 Fed. 86.

In determining whether the relation of an illegal transaction is sufficiently close to the plaintiff's cause of action as to preclude recovery, the test is frequently stated to depend upon whether the plaintiff can establish his claim without requiring the aid or proof of the illegal contract. If the plaintiff can establish his case without relying upon the illegal contract he may recover. *Teich* v. *City of Chicago,* 298 Ill. 498; *Armstrong* v. *American Exchange Bank,* 133 U. S. 433; *Clemens* v. *Crane,* 234 Ill. 215; *Kearney* v. *Webb,* 278 id. 17.

In the present case the plaintiff could establish a *prima facie* case by introducing its note and making computation, because the due execution of the note was not denied so as to put the plaintiff upon such proof. The mere fact that

the plaintiff did introduce other evidence before it became necessary does not change this rule.

Appellants place great emphasis upon proof that the National Bank of the Republic, Banco, the smaller banks and other affiliated enterprises procured the fidelity insurance protection in one policy in which they were all named; that the directing officials frequently met and discussed policies and other matters of common interest, and that the proof shows that persons interested in these several enterprises were so interconnected that they were all under the domination of the National Bank of the Republic. This may be assumed true, but each bank functioned separately and was required to comply with banking requirements and regulations; all of them had stockholders and depositors who could require the observance of the banking law. The fact that the National Bank of the Republic might dominate a smaller bank did not eliminate the interest of the depositors or the public. In this case, the sum of the facts discloses that when the directors of the Madison Square State Bank borrowed money to make it more liquid it was doing a lawful act for a good consideration, which did not become illegal because the money was borrowed from the National Bank of the Republic. The restraint against branch banking, like other banking regulations, is based upon a public policy to further the interest of the depositor and the public.

Public policy also lies at the base of the law in regard to enforcing illegal contracts, and the rule is adopted not for the benefit of the parties to the contract, but to the public. We have held public policy requires banking laws should be construed with the object of protecting depositors and the public. (*Knass* v. *Madison and Kedzie Bank, supra; People* v. *Wiersema State Bank,* 361 Ill. 75.) Public policy frequently requires the enforcement of a contract tinged with illegality where not to do so would produce a harmful result on the persons for whose protection

the law violated exists. Applications of this principle appear in *Ferguson* v. *Sutphen,* 3 Gilm. 547; *Niblack* v. *Farley,* 286 Ill. 536; *Union Nat. Bank of St. Louis* v. *Matthews,* 98 U. S. 621, 25 L. ed. 188; *Thompson* v. *St. Nicholas Nat. Bank,* 146 id. 240, 36 L. ed. 956; *Kerfoot* v. *Farmers and Merchants Bank,* 218 id. 281, 54 L. ed. 1042; *Fergus Co.* v. *Osweiler,* 82 Pac. (2) (Mont.) 410; *Lester* v. *Howard,* 33 Md. 558, 3 Am. Rep. 211. If Banco was violating the law prohibiting branch banking the defendants were much more involved in the transaction than the National Bank of the Republic whose participation, if any, was without the official sanction of its constituted authorities. The law will not, under such circumstances, permit the creditors of the latter to be injured.

We are clearly of the opinion that the plaintiff was entitled to recover, and the judgment of the Appellate Court for the First District is, accordingly, affirmed.

*Judgment affirmed.*