(No. 26860.—Judgment affirmed.)

L<small>EO</small> G<small>EORGE</small> *et al.,* Appellees, *vs.* T<small>HE</small> C<small>ITY</small> O<small>F</small> D<small>ANVILLE,</small> Appellant.

*Opinion filed May 20, 1943—Rehearing denied Sept. 15, 1943.*

S<small>MITH</small>, J., dissenting.

R<small>ALPH</small> R<small>OUSE</small>, Corporation Counsel, and A<small>CTON</small>, A<small>C-</small> <small>TON</small>, B<small>ALDWIN</small> & B<small>OOKWALTER</small>, (W. M. A<small>CTON</small>, of coun- sel,) for appellant.

LONDRIGAN & LONDRIGAN, PENWELL, BURK, TWOMEY & JOHNSON, and HAL M. STONE, for appellees.

Mr. JUSTICE FULTON delivered the opinion of the court:

This was an action at law brought by forty-two members of the fire department of the city of Danville, against said city to recover the difference between the amount actually paid them for their services since July 13, 1937, and $175 per month, being the minimum salary provided by an act of the legislature effective July 13, 1937, as applied to the city of Danville.

The record shows that each of these plaintiffs, on July 14, 1937, on May 17, 1938, and on May 1, 1939, addressed petitions to the mayor and city council of Danville, requesting that the city council do not reduce the number of employees on the fire department and pledging that they would not at any time claim or present any action with reference to the difference between their present salaries and the statutory salary of $175 per month. By these petitions they recognized the inability of the city to pay the statutory salaries and recognized that it would be necessary for the city to reduce the number of employees on the fire department if they were to receive the full statutory salary. It was also stated in the petitions that the reducing of the number of employees in the fire department would throw an undue burden upon the remaining members and would deprive certain members of a means of livelihood. It is conceded that prior to the passage of the Minimum Wage Act these plaintiffs had been receiving lower wages than they received after passage of this law. The record shows that by these petitions it was the agreement and understanding between the parties that the salaries would be increased over the previous year regardless of the question of the constitutionality of the Minimum Wage Act, and the increased salaries would remain the salaries of

the firemen even though the act might be repealed or declared unconstitutional.

The city defended the suit on the ground that it had relied upon the petitions and to permit the plaintiffs to repudiate the same would be to the prejudice of the city of Danville. It also set up several special defenses.

The circuit court of Vermilion county, where the case was tried without a jury, refused to grant any judgment for the difference in the salaries during the period covered by the three contracts, but entered judgment for each of the plaintiffs in the respective amounts claimed subsequent to May 1, 1940. The Appellate Court reversed the judgment of the circuit court of Vermilion county and remanded the cause to that court with directions to enter judgment in favor of appellees for the amounts claimed in their complaint. Because of a certificate of importance the appeal is brought to this court.

The trial court based its opinion on the ground that appellees were estopped from claiming the additional wages prior to May 1, 1940. It sustained the second and fifth special defenses set up by the appellant in defense of the action. Special defense No. 2 alleged that appellees were estopped from maintaining their action. Special defense No. 5 set forth that to permit the appellees to recover would sustain a claim that would constitute a fraud upon the city, and for that reason the action should be barred.

In the Appellate Court it was held that by the enactment of the Minimum Wage Act the legislature had determined that the general welfare of the public demanded minimum wages for firemen and that such was the public policy of this State. This being so, it was impossible for the plaintiffs to surrender their rights because such a surrender would thwart the public policy of the State. It also held that the plaintiffs' claims were not barred by the doctrine of promissory estoppel because no such estoppel could operate where the promises upon which it was predi-

cated were contrary to public policy and therefore void. It also held that the defense of *laches* was not good because the legislation was subject to attack in the courts and by an attempt to repeal in the General Assembly until October 11, 1940.

It is conceded that the contracts violated the public policy of the State, and for that reason were invalid. *Anderson* v. *City of Jacksonville,* 380 Ill. 44; *Galpin* v. *City of Chicago,* 269 Ill. 27; *Pitsch* v. *Continental and Commercial Nat. Bank,* 305 Ill. 265.

The Firemen's Minimum Wage Act (Ill. Rev. Stat. 1941, chap. 24, par. 12-1,) has been before this court many times since its passage in 1937. In *People ex rel. Moshier* v. *City of Springfield,* 370 Ill. 541, it was held constitutional. The holding in that opinion was upheld and approved in the case of *Littell* v. *City of Peoria,* 374 Ill. 344, and *Morgan* v. *City of Rockford,* 375 Ill. 326. Since the constitutionality of the act was definitely determined by the foregoing opinions, two cases have been decided by this court involving situations similar to that in the present case, *Kennedy* v. *City of Joliet,* 380 Ill. 15, and *Anderson* v. *City of Jacksonville,* 380 Ill. 44.

In the *Joliet case* the policemen and firemen of Joliet had, on July 29, 1937, filed a waiver agreement expressing their understanding that the revenue of the city of Joliet did not and would not permit a compliance with the Minimum Wage Act without a reduction in the number of employees in both the police and fire departments. This agreement provided, "And whereas, the undersigned is desirous that said number of employees be not reduced; first, because he might possibly be one of those whose services would be dispensed with, or if not, the additional burden of work falling on the remaining employees would be excessive, now, therefore, in consideration that the city of Joliet do not reduce the number of employees in said departments, the undersigned herewith waives any rights

he may have acquired under and by virtue of said statutory enactment and agrees to accept payment of his present rate of salary as payment in full of all moneys due him from time to time during his employment and to waive any additional claim for salary and release the city of Joliet from any claim for difference between the salary now being paid to him, or to be paid to him from time to time, and the said statutory minimum." In addition to this agreement, the pay checks which plaintiffs received had a release form upon them, on the back. This court there held that these releases were void and the agreement was void as being against public policy.

At the same term of this court the case of *Anderson* v. *City of Jacksonville,* 380 Ill. 44, was decided. In that case, releases were signed by each member of the police department, which releases provided, "The undersigned officer or employee of the City of Jacksonville, Illinois, hereby acknowledges receipt of all sums due and owing to him from City for wages, salary or· otherwise, down to and including the 15th day of January, 1938, and in consideration of such payment and the execution of a similar receipt and release by any or all other employees or officers of said City, the undersigned and each of them severally release the said City from any and all claims or demands of every nature which they and each of them may have had against the said City, down to and including the date above mentioned." This court held that these releases were void regardless of whether the policemen be called officers or employees. The court also stated that an examination of the releases, taken as a whole series, shows their true character, *i. e.,* a continuing agreement between the city and the policemen to evade the Policemen's Minimum Wage Act, and for that reason they were declared void.

It is strenuously insisted by the appellant that notwithstanding the conceded invalidity of the contracts as vio-

lating public policy, the conduct of the appellees leading up to the execution of the contracts, and subsequent to their execution, is sufficient to estop appellees from recovering the wage difference. However, the essential elements upon which an estoppel could be based were lacking in the making of these contracts. There was no misrepresentation or concealment of material facts upon which the other party relied, and there was no ignorance of the truth of the matter by the party to whom the representation was made. (*Young* v. *Illinois Athletic Club*, 310 Ill. 75; *Galpin* v. *City of Chicago*, 269 Ill. 27.) While the negotiations were carried on in great detail, the parties were at all times dealing at arm's length. They were both charged with knowledge that the contracts were invalid because they violated the spirit of the statute and were contrary to the public policy of the State.

It is further urged by appellant that to permit appellees to recover the wages sought in this case would constitute a fraud upon the city of Danville. The record in the case shows clearly that the appellant was responsible for starting the negotiations which resulted in an evasion of the new Minimum Wage Act. Within a month after the act was adopted a meeting of the city firemen was called at the request of the corporation counsel. There the terms of the new law were explained and the suggestion of entering into an agreement to pay salaries less than the statutory minimum was made. The firemen were told at this meeting that unless they executed the proposed agreement it would be necessary to discharge twenty-five members of the department in order to meet the requirements of the statute from city funds available for that purpose. For three years similar contracts were executed. While the evidence in the case indicates an intention on the part of the city to eventually comply with the Minimum Wage Act and not to curtail the number of employees on the fire department, there was no step taken by the city

for immediate compliance. Under these circumstances we believe the city was not in a position to urge fraud or estoppel against the appellees' right to assert the invalidity of such agreements.

The appellant urges that the facts in the *Jacksonville* and *Joliet cases* are not contrary to its position. In this we do not agree. The factual situation is almost identical with the one presented in the case of *Kennedy* v. *City of Joliet*, 380 Ill. 15, except the lay-off plan which is not involved here. The methods used and the circumstances under which the agreements were signed in that case are almost a repetition of what happened in Danville. In the *Jacksonville case* it was stated, "Compensation for the performance of the duties required of plaintiffs in this case cannot be made a matter for traffic, bidding or trade, and any contract to accept any other or different compensation than that provided for by statute is contrary to public policy and void." The decisions of this court show that it is definitely committed to the conclusion that a contract made in violation of established public policy will not be enforced.

Seemingly, every point raised by appellant was raised and decided by this court in *Pitsch* v. *Continental and Commercial Nat. Bank,* 305 Ill. 265, and the pronouncements of the court in the *Joliet* and *Jacksonville cases* are broad and complete enough to authorize the affirmance of the judgment of the Appellate Court in this case.

*Judgment affirmed.*

Mr. JUSTICE SMITH dissenting:

As I view it, the majority opinion omits any reference to certain pertinent and, as I believe, decisive facts, which are uncontroverted in the record.

In July, 1937, a petition was presented to the city council signed by all of appellees in which the proposal was made that all of appellees be retained at a basic wage

of $112 per month, which was an increase of $12 per month over what they were then receiving. Further negotiations were had. Finally the city council, by an appropriate resolution duly adopted and passed, accepted the proposition made by appellees in their petition. On the basis of this proposition and the resolution accepting it, a suitable appropriation was made in the annual appropriation bill for the current fiscal year 1937-1938. All of appellees were retained as firemen and paid at the basic wage of $112 per month for the balance of the fiscal year, in accordance with the contract.

In May, 1938, a like petition was presented by appellees to appellant relative to the current fiscal year 1938-1939. Like negotiations were had with a like result. The petition was identical with the petition presented in July, 1937, except the basic wage for the 1938-1939 fiscal year was raised to $134.12 per month, an increase of $34.12 per month over the wages received by appellees prior to the effective date of the Minimum Wage Act of 1937. This proposition was accepted by appellant by an appropriate resolution duly adopted and passed, and the annual appropriation bill made suitable provisions for the payment of the increased wages. All of appellees were retained by appellant as firemen during the 1938-1939 fiscal year and were paid in accordance with that proposition, and the resolution accepting it, on the basic wage of $134.12 per month.

On May 3, 1939, a like petition was presented by appellees to appellant and duly accepted by an appropriate resolution adopted by appellant. This petition was the same as the former petitions, except the basic wage therein fixed was $142.78 per month, which was an increase of $42.78 per month over what appellees had received prior to the effective date of the Minimum Wage Act. After the adoption of the resolution accepting the proposal contained in that proposition, appellees were all retained as firemen during the balance of the 1939-1940 fiscal year

and were paid the increased wages, as provided in that contract. In each of these petitions appellees expressly agreed that they would "make no claims, legal or otherwise, for compensation for our services in excess of" the basic wage specified in each contract.

Also in 1938, at the request of appellees, appellant called an election to be held in the city on April 12. This election was called for the purpose of submitting to the voters of the city of Danville the proposition to authorize, for a period of five years, an increase in the general corporate taxes in excess of the maximum rate which could be levied without such vote. In connection with the submission of the proposition to the voters, the city council passed a resolution by which all the additional funds to be raised by the increased tax rate, if authorized, were pledged solely to the payment of the increased wages of the police and fire departments. It further provided that the increased taxes received should be prorated, as an increase in wages, between the police and fire departments, according to the number of men employed in each department. At the election, the proposition was approved by a majority vote. Thereafter the additional levy was made and the increased funds received were appropriated and used for the payment of the increase in salaries of firemen and policemen, in accordance with the resolution. The record justifies the conclusion that this was a part, and in furtherance of, the scheme to enable the city to retain all of appellees as firemen and, starting at the minimum wage fixed by the 1937 contract, pay wages increasing as the financial condition of the city would permit.

Preceding the election to vote on the question of increasing the taxes, appellees were active in support of the proposition. For the purpose of inducing the voters to approve the increased taxes they published a notice in the local newspaper, which is, in part, as follows:

"The only method we have of obtaining an increase in wages is to appeal to YOU, the citizens of Danville.

"At present, ours is the lowest paid fire department, among cities the size of Danville, in the state of Illinois. In July, 1937, we signed a 'gentlemen's agreement' with Danville's city officials, in which we promised we would not force payment of the new minimum wage scale established by state law, until a means of obtaining additional revenue could be obtained by the city. This agreement remains in effect until May 1, 1938.

"We realize that if we forced this wage increase as provided for us by the new state law it would result in a curtailment of our department's personnel, which not only would force more men out of employment but also would place the lives and property of our fellow citizens in jeopardy in the face of a conflagration. With a reduced fire fighting force, we would not be able to cope with the disasters which might arise in our homes, schools, churches, hospitals and places of business.

"We also realize that a reduction in fire department personnel would tend to raise the fire insurance rates in this city to the extent that it would place a burden financially on local buyers of insurance. Again, we appeal to you, the citizens of Danville, and ask that on April 12th you vote YES on the proposal to levy a 2-mill tax here."

After the last contract expired, by its terms, appellees brought this suit to recover the difference in the wages they actually received, and what they would have received had they been paid the minimum rate of $175 per month, the total amount of which aggregated some $60,000. This was in violation of the express terms of their contracts.

The fifth special defense is, in substance, that to permit appellees to recover the wages sought to be recovered in this case would constitute a fraud on appellant. In determining whether the contracts should be enforced as a defense to the action, we should not lose sight of the fact that the contracts were void only for the reason that they were prohibited by statute. They were not inherently criminal, or immoral. No penalty was provided for the making of a contract of this kind. They were *malum prohibitum* and not *malum in se*. It was unlawful for the parties to enter into the contracts, not because they

involved a criminal act or were against public morals, but only because they were contrary to the established public policy of the State, found in the Firemen's Minimum Wage Act.

The rule that contracts which are not inherently criminal or immoral, but which are unlawful merely because they are prohibited by statute or public policy, will not be enforced, is subject to two well-recognized exceptions. The first exception is in cases where the parties to the contract are both *in delicto* but are not *in pari delicto*. The courts recognize the distinction between cases where the parties are *in delicto* and those where they are *in pari delicto*.

Another exception to the rule that courts will not enforce a contract which violates the public policy is applied in cases where the public welfare or public policy requires that a contract, not intrinsically immoral or illegal, be enforced notwithstanding its illegality. In such cases, although the parties are *in pari delicto*, yet the court may intervene and grant relief to one of them where public policy requires such intervention, even though the result may be that a benefit from the contract will be derived by one who is equally guilty with the other. In 13 C. J., p. 497, sec. 441, the rule is stated as follows: "Although the parties are *in pari delicto*, yet the court may interfere and grant relief at the suit of one of them, where public policy requires its intervention, even though the result may be that a benefit will be derived by a plaintiff who is in equal guilt with defendant. But here the guilt of the parties is not considered as equal to the higher right of the public, and the guilty party to whom the relief is granted is simply the instrument by which the public is served." Many cases are cited in support of the text. The rule is restated in 17 C. J. S., p. 665, sec. 278a, and the original text is further supported by the citation of numerous later cases.

This rule is enforced in cases where it is evident that some greater public good can be subserved by enforcing the contract than by refusing to enforce it. Under the rule, contracts made in violation of law have been enforced where the public policy will be best served by such enforcement, notwithstanding the invalidity of the contract. (*Bowditch* v. *New England Mutual Insurance Co.* 141 Mass. 292, 4 N. E. 798.) Courts will seize every opportunity to prevent a guilty party from enjoying the fruits of his iniquity where to refuse to enforce the contract would result in greater injury or violation of the public policy. Thus, although a trust may be created in violation of public policy, still the trustee will not be permitted to hold the trust estate, discharged of the trust, although the *cestui que trust* is equally guilty with the trustee and is incapable of holding the property, either in law or in equity. *Miller* v. *Davidson,* 3 Gilm. 518.

In 6 R. C. L., p. 829, sec. 220, it is said: "Public policy, it must be borne in mind, lies at the basis of the law in regard to illegal contracts, and the rule is adopted, not for the benefit of parties, but of the public. It is evident, therefore, that cases may arise even under contracts of this character, in which the public interests will be better promoted by granting than by denying relief, and in such the general rule must yield to this policy. Hence, even between parties *in pari delicto,* relief will sometimes be granted, if public policy demands it. The general rule operates only in cases where the refusal of the courts to aid either party frustrates the object of the transaction, and takes away the temptation to engage in contracts *contra bonos mores,* or violating the policy of the law. If it is necessary, in order to discountenance such transactions, to enforce such a contract at law, or to relieve against it in equity, it will be done, though both the parties are *in pari delicto.*" This text is supported by cases cited from

many States. The same rule is restated in 12 Am. Jur., p. 729, sec. 214, where the supplemental notes are supported by cases from most every State in the Union. This rule was clearly stated by this court in *Central Republic Trust Co.* v. *Evans,* 378 Ill. 58, as follows: "Public policy frequently requires the enforcement of a contract tinged with illegality where not to do so would produce a harmful result on the persons for whose protection the law violated exists. Applications of this principle appear in *Ferguson* v. *Sutphen,* 3 Gilm. 547; *Niblack* v. *Farley,* 286 Ill. 536; *Union Nat. Bank of St. Louis* v. *Matthews,* 98 U. S. 621, 25 L. ed. 188; *Thompson* v. *St. Nicholas Nat. Bank,* 146 id. 240, 36 L. ed. 956; *Kerfoot* v. *Farmers and Merchants Bank,* 218 id. 281, 54 L. ed. 1042; *Fergus Co.* v. *Osweiler,* 82 Pac. (2) (Mont.) 410; *Lester* v. *Howard,* 33 Md. 558, 3 Am. Rep. 211."

While the courts will not enforce contracts entered into either in violation of law, or of a rule of public policy where the interests of the parties thereto are alone involved, still, when the public interest is involved, it will enforce such contracts as long as public policy requires such enforcement. This rule is supported by a uniform line of decisions in all cases where the question has arisen. The law will not permit either party to be injured by the nonenforcement of the contract. *Central Republic Trust Co.* v. *Evans,* 378 Ill. 58.

Appellees, when they entered into the contracts with appellant, were dealing with a public agency,—a municipality,—acting only as the representative of the public. By their affirmative acts they promoted and assisted in obtaining a vote of the public favorable to the additional tax. The approval and levy of this tax were necessary to enable appellant to carry out the provisions of the contracts made in 1938 and 1939. As a result of this favorable vote on the proposition to levy the additional tax, taxes were levied and collected. The additional taxes collected have

been paid to appellees as increased wages under, and in accordance with, the resolution so pledging the same.

Appellants had the right to discharge any one or all of the appellees at any time. It was under no legal obligation to retain them on its payrolls for any period of time, long or short. They were not appointed or employed for any fixed term or period of time. In order to induce appellant to retain them in its employ, at an increased wage, they expressly agreed in writing, in each of the three years involved, that they would "make no claims, legal or otherwise, for compensation for our services in excess of" the rate of wages fixed by the contracts. Had no such agreements been made the city would have carried out its program by reducing the force and thereafter paying the minimum wage fixed by statute. By the conduct of appellees it was induced to change that program to thereafter conform to the agreements. It complied with the agreements, in all respects.

After having received all the benefits it was possible for them to receive under the contracts, appellees are now permitted to repudiate the contracts and retain such benefits, even though the other party to the contracts cannot be placed in *status quo*. This is not in accordance with my conception of the standard of integrity which ought to prevail between a governmental agency and its employees. The integrity of contracts should be sustained wherever possible, whether such contracts are between individuals, alone, or between individuals and sovereignties. In my opinion, the result is a fraud, not only on the city of Danville, but on the public, which was induced by appellees, to vote and pay additional taxes, in order to enable the city to comply with the contracts, which appellees are now permitted to repudiate. Such a palpable fraud, in my opinion, find no support when tested in the crucibles of ordinary justice.