EXCHANGE NATIONAL BANK OF CHICAGO, Plaintiff-Appellee,

v.

Harold DANIELS and Irene Daniels, Defendants-Appellants.

Nos. 84–2037, 84–2232 and 84–2737.

United States Court of Appeals, Seventh Circuit.

July 12, 1985.

Narcisse A. Brown, Schwartz, Cooper, Kolb & Gaynor Chtd., Chicago, Ill., for plaintiff-appellee.

James B. Burns, Isham, Lincoln & Beal, Chicago, Ill., for defendants-appellants.

Before WOOD and EASTERBROOK, Circuit Judges, and DUMBAULD, Senior District Judge.[*]

EASTERBROOK, Circuit Judge.

Our decision in this case dismissed two of the three appeals as untimely, 763 F.2d 286. The third appeal, we held, brought up only the award of attorneys' fees, which we affirmed. The district court's judgment on the merits was entered on May 10, 1984, and appeal No. 84–2037 was filed on June 18. The decision to dismiss this appeal rested in part on a construction of a minute order of the district court filed on June 28, stating that the "time for filing notice of appeal is extended ten (10) days from May 10, 1984." This is a puzzling order, because the Danielses (the Borrowers) had 30 days from May 10 even without the order. But because the parties had not sought clarification of this order from the district court and had not argued its meaning in this court, we concluded that it did not make the notice of appeal filed June 18 timely. Before reaching this conclusion, we searched the record for any clue about of the order's meaning, particularly a contemporaneous explanation by the district court. We found none.

[*] The Honorable Edward Dumbauld of the Western District of Pennsylvania is sitting by designation.

After we decided the case, the Borrowers had the court reporter prepare a transcript of the proceedings before the district court on June 28. This transcript reveals that the district judge meant to grant an extension sufficient to permit a timely appeal. The judge stated that "if I gave you another 10 days, that takes you to June 19th, and you file[d] it on the 18th.... I think you are entitled to a 10-day extension from May 10th, because I think you are entitled to appeal." The Borrowers state in their petition for rehearing that the minute order was supposed to grant an extra ten days from *June* 10, rather than from May 10. So reconstructed, the order makes the notice of appeal in No. 84–2037 timely.

We are dismayed that the Borrowers' counsel did not bring the proceedings of June 28 to our attention in their brief on the merits. The two excuses they give— first that no one reads minute orders very carefully, second that "everyone knew" the meaning of the order and so did not think it necessary to elaborate—are not very persuasive.[1] The order in this case was a potential basis of jurisdiction. The Borrowers should have expected the court to read it carefully, even if they did not. And the judges of this court cannot know that "May 10" really means "June 10" unless the party relying on the order brings the necessary information to light. Almost all of the briefing on the jurisdictional issue was devoted to the question whether the judgment of May 10 was "final" and appealable; neither side paid any attention to the meaning of the order of June 28. It is more than a little discomfiting to learn, after disposing of all the grounds that had been presented for decision, that the effort was wasted.

Nonetheless, just as a court must notice a lack of jurisdiction even when

raised for the first time in a petition for rehearing, so the court must decide on the merits any case of which it has jurisdiction, even when the ground of jurisdiction appears belatedly. We therefore take jurisdiction of appeal No. 84–2037. For the reasons stated in our opinion of May 29, 1985, however, appeal No. 84–2232 is untimely, and appeal No. 84–2737 presents only the question of fees. Our original opinion therefore stands, although it has become necessary to address the merits in appeal No. 84–2037.

The district court granted summary judgment for Exchange National Bank (the Bank), and to the extent facts are disputed (largely they are not), we draw inferences in favor of the Borrowers.

The affidavits and depositions filed in the district court show that Harold Daniels is the maker, and Irene Daniels the guarantor, of a note for $4.5 million. The Bank extended credit to the Borrowers on the basis of representations made by the Borrowers that they would use the money in their cattle business. The Borrowers furnished financial statements showing their personal and business assets. When the Borrowers did not pay, the Bank filed this diversity suit to collect.

The Borrowers paint a more sinister picture. They say that much of the money was invested not in their personal business but in that of Four Way Cattle Co. The Borrowers held a one-fourth interest in Four Way; other equal shares were held by Robert Odle, William Clune, and Ronald Garrett. Clune and Garrett were the officers of the Bank responsible for approving and supervising the loan to the Borrowers (and thus to Four Way). It is unlawful for a borrower to misrepresent affairs to a national bank in seeking a loan; it is undisputed that the Borrowers misrepresented

---

**1.** We reproduce the explanations lest readers think we exaggerate. "The lack of clarity in the order was not attributable to either Judge Will or Counsel. The Northern District of Illinois relies on minute orders prepared by a clerk rather than separately typed orders prepared by the parties.... Thus the parties do not compose or immediately see the words the judge's clerk used. Such a procedure ought not deprive one of the right to appeal.... We regret that the transcript was not cited to the panel, but claim some comfort in the fact that when all of the parties to a document understand and acknowledge its meaning, the human tendency is to discount the possibility that others will interpret it differently."

the assets that would support repayment by describing Four Way's assets as their own. It is also unlawful for officers of a national bank to make loans in which they have beneficial interests, at least without specific written approval of a sort missing here. 18 U.S.C. § 1006; 12 C.F.R. § 215.5.

The Borrowers imply that Clune and Garrett initially induced them to borrow for the use of Clune and Garrett in order to have access to legitimate loans for the purpose of buying cattle. Then, the Borrowers maintain, Clune and Garrett induced them to borrow ever-increasing sums in order to avoid disaster; Harold Daniels says that Clune told him that any resistance to increases would "lead to [his] being financially ruined." Clune and Garrett supposedly assured the Borrowers that they would not be personally liable to the Bank because Clune and Garrett would repay any credit of which Clune and Garrett had the benefit. An affidavit suggests that a Vice Chairman of the Bank knew that Clune and Garrett had a beneficial interest in the proceeds of the loans to the Borrowers; the affidavit does not suggest, however, that the Bank ever approved this interest formally or knew that Clune and Garrett had promised to excuse the Borrowers' repayment.

■ We agree with the district court that these facts do not give the Borrowers a defense to the suit on the note. The note is unconditional on its face. It says nothing about the uses of the funds; it does not set out any circumstances under which the Borrowers may decline to pay. It is agreed that the Borrowers received the $4.5 million (although the Bank disputes whether they turned all of this over to Four Way). No one maintains that Clune and Garrett had actual authority to excuse repayment. Indeed, under Illinois law, which applies to this diversity case, even an express pledge not to collect the note would have been ineffectual. See *Central Republic Trust Co. v. Evans*, 378 Ill. 58, 37 N.E.2d 745 (1941), in which the Court ordered repayment even though the Chairman of the bank explicitly promised not to collect.

Such a promise, the Court concluded, required at least the formal approval of the Board of Directors, and even that might not have been enough in light of the obvious threat to the bank's business of promises not to collect loans. There was no formal approval here, and *Evans* therefore is dispositive. Moreover, the promise (as the Borrowers describe it) was that Clune and Garrett would make good the debt. This is a matter among the Borrowers, Clune, and Garrett; it does not excuse the Borrowers from paying the Bank.

■ The Borrowers try several devices to avoid this result. The Borrowers say, for example, that there was a lack of consideration for the note. Yet it is undisputed that the Borrowers received the $4.5 million and re-lent it to Four Way, in which they held a 25% interest. This is a lot more than a peppercorn, which would be consideration enough.

The Borrowers say that the loan was an illegal tie-in under 12 U.S.C. § 1972 because the Bank "tied" the extension of lawful credit (for the Borrowers' use in buying cattle) to unlawful credit (for the benefit of Four Way). The Borrowers never quote the statute, and for good reason. The pertinent portion says that a "bank shall not ... extend credit ... on the condition or requirement—(A) that a customer shall obtain some additional credit, property, or service from such bank *other than a loan* ..." 12 U.S.C. § 1972(1) (emphasis added).

■ This court has construed § 1972 as prohibiting exclusive dealing practices—those that attempt to prevent customers from dealing with other banks. *McCoy v. Franklin Savings Association*, 636 F.2d 172, 175 (7th Cir.1980). It is similar to other anti-tying laws meant to preserve competition among rival businesses. We treat it, in other words, as the banking equivalent of § 3 of the Clayton Act, 15 U.S.C. § 14. It does not prevent banks from making one in-house loan contingent.

on another.[2] The Borrowers do not say that the Bank forced them to take credit from the Bank when they really wanted to borrow the money for Four Way somewhere else.

█ Perhaps equally important the statute also does not say that any actual loan in violation of its terms is unenforceable. Section 1975 permits a treble damages action by an injured party, but an obligation to pay back a loan actually made is not an injury. See *Connolly v. Union Sewer Pipe Co.*, 184 U.S. 540, 22 S.Ct. 431, 46 L.Ed. 679 (1902) (the parallel damages provision in the antitrust laws does not allow a buyer of goods to keep them without payment, whether or not the price is monopolistic); *Kelly v. Kosuga*, 358 U.S. 516, 79 S.Ct. 429, 3 L.Ed.2d 475 (1959) (same).

█ The only other argument that requires comment is the contention that Clune and Garrett had the authority to excuse repayment because they were acting in the interest of the Bank. Their acts, the Borrowers tell us, aided the Bank by inducing the Borrowers to take the money and promise to pay interest; more, at the outset of the relation the Borrowers used some of the proceeds to buy at auction cattle the Bank was trying to sell in order to realize on collateral for a loan. *Evans* suggests that even actual benefit to the Bank would not be enough to support a promise not to collect.[3] But we agree with the district court that no evidence in this record supports an inference that Clune and Garrett acted on behalf of, or produced any benefit for, the Bank, either by inducing the Borrowers to take the loan or by promising the Borrowers that they would not need to repay.

█ The reason why bank officials may not approve loans of which they will be beneficiaries is that they will be tempted to overlook the bank's ordinary standards. They may make loans that present extra risks. They may not scrutinize creditworthiness of buyers with an eye single to the bank's prosperity; they may allow borrowers certain advantages in return for benefits to themselves. That happened here. Clune and Garrett apparently approved unsecured loans to be repaid from the Borrowers' personal income and assets, although they knew that the Borrowers would put the funds at the disposal of Four Way and hence that the Borrowers' assets would not increase commensurately with their liabilities. Clune and Garrett supposedly told the Borrowers they would not be responsible for making good the loans, thus further jeopardizing the Bank. No reasonable observer could have thought that Clune and Garrett did this for the welfare of the Bank. In particular the Borrowers could not have thought that Clune and Garrett acted with the Bank's interests at heart. A fiduciary (such as Clune and Garrett) may be guilty of fraud against the principal just by exposing it to

**2.** There would be no point to such a prohibition. If a potential customer approached a bank seeking $100,000, a bank might logically say: "The purpose for which you want the loan requires an investment of $200,000. We will not lend less than that." If the bank may insist on making a loan of a minimum size, it also may say: "We will lend you $100,000 but only on the condition that you borrow another $100,000." Credit is a single product, cf. *Times-Picayune Publishing Co. v. United States*, 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953), and it is hard even to think of a "tie" of a product to itself.

**3.** The borrowers cite several cases holding that fraud by an agent may be imputed to the principal although the fraud is not in the principal's interest. E.g., *National Acceptance Co. v. Coal Products Association, Inc.*, 604 F.2d 540, 542–43 (7th Cir.1979). These cases are irrelevant.

None holds that a person who actually received a loan does not have to pay it back. The issue here is not imputation of wrongdoing but the legal consequence of a statement, no matter who is deemed responsible. If Clune and Garrett had deceived the Borrowers about the nature of the document they were signing, or if they had taken the checks so that the Borrowers never received the money, the cases the Borrowers cite might be pertinent. But as it stands, the Borrowers knew they had signed an unconditional note, they received the money, and when they submitted false documents to the Bank they became active participants in the scheme. *Evans* holds that in the banking business no officer has apparent authority to lend money with a promise not to collect, and it governs here.

uncompensated risks. See *United States v. Dial,* 757 F.2d 163, 169–70 (7th Cir.1985). Here the risks were obvious, and they have produced the very kind of injury that the restrictions placed on officers are supposed to avoid.

We reject Borrowers' remaining arguments for the reasons well stated in the district court's thoughtful opinion.

The motion to supplement the record with the transcript of proceedings on June 28, 1984, is granted. The petition for rehearing in No. 84–2037 is granted. The judgment under review on that appeal is affirmed. The petition for rehearing in Nos. 84–2232 and 84–2737 is denied. No judge in regular active service has called for a vote on the suggestion of rehearing en banc, which is therefore rejected. Circuit Judge Cudahy did not participate in the consideration or decision of the suggestion for rehearing en banc.