Garrett R. QUINTANA, Sr., Plaintiff,

v.

FIRST NATIONAL BANK OF
SANTA FE, Defendant.

Civ. No. 92–0714 LH/WWD.

United States District Court,
D. New Mexico.

April 29, 1994.

F. Joel Roth, Roth, Van Amberg, Gross, Rogers & Ortiz, Santa Fe, NM, for plaintiff.

Michael R. Comeau, Carpenter, Comeau, Maldegren, Brennan, Nixon & Templeman, Santa Fe, NM, for defendant.

## MEMORANDUM OPINION

HANSEN, District Judge.

Plaintiff Garrett R. Quintana, Sr. ("Quintana, Sr.") filed suit in this Court, in part

claiming violations of the Bank Holding Company Act, 12 U.S.C., §§ 1971, *et seq.* ("BHCA") against First National Bank of Santa Fe ("the Bank").[1] Specifically, Quintana, Sr., alleges that he sought a loan from the Bank in 1989 to finance the purchase of 324.64 acres for what is known as the Vista del Monte project. He further alleges that conditions imposed by the Bank to this extension of credit violated the BHCA. On May 3, 1993, the Bank filed a Motion for Summary Judgment (Docket No. 71). Having heard oral argument of the parties, and having reviewed the briefs of the parties, I conclude that summary judgment should be granted in the Bank's favor and that this case should be dismissed.

## I. *Facts*

It is necessary for me to review the business relationships and transactions that the borrower, Quintana, Sr., and his son, Garrett R. Quintana, Jr. ("Quintana, Jr.") had with each other as well as with the Bank, prior to and during September of 1989.[2] I find the following facts are substantially undisputed:

1. In 1984, the Bank made a loan to Lincoln Partners to finance the purchase of the Sears Building in Santa Fe. Quintana, Jr., was the general partner. Quintana, Sr., was not a partner in this partnership, nor was he a party or a guarantor to the loan agreement. In Paragraph 9 of its Statement of Material Undisputed Facts, the Bank states, and it is undisputed by Quintana Sr.: "On September 4, 1984, Quintana, Sr. conveyed ... two pieces of real property.... The reason Quintana, Sr. conveyed the two St. Francis properties to Quintana, Jr., was so that he [Quintana, Jr.] could pledge them as collateral for the Sears loan." Quintana, Sr., stated at his deposition, that "the bank was requesting that." When asked if he was happy to comply, he stated that he was happy to help him [*i.e.*, Quintana, Jr.]. One day

later, on September 5, 1986, Quintana, Jr., conveyed the properties back to Quintana, Sr. In 1986, Quintana, Sr., once again conveyed one of these properties to Quintana, Jr. On March 6, 1989, Quintana, Sr., executed a mortgage to the Bank to secure the payment of Quintana, Jr.'s, August, 1984, note on the Sears property.

2. In 1985, the Bank owned the Calle Lorca property, offered to sell it to Quintana, Jr., and to finance its purchase. Quintana, Sr., had no ownership or financial interest in this property. In 1985, the Bank loaned $211,500 to Quintana, Jr., to finance acquisition of Calle Lorca.

3. A dispute arose over an easement and over additional financing, both relating to the Calle Lorca property. When the Bank refused to give this additional financing, Quintana, Jr., quit paying on the loan.

4. In 1985, the Bank made a $355,000 loan to the Vista Verde partnership, which was composed of Quintana, Jr., and C.L. Brown, for the purchase of some vacant land. Quintana, Sr., was not a party to the loan documents, but he did participate in these loan negotiations.

5. In 1987, C.L. Brown purchased the Vista Verde loan, using new loan proceeds from the Bank to do so. At that time, Quintana, Sr., guaranteed the 1985 Vista Verde note. Brown pledged this guarantee to secure his indebtedness.

6. In August of 1989, Quintana, Sr., had three loans existing with the Bank. His co-obligors on these loans were Richard Montoya on two loans, and Rita and Richard Montoya on the third.

7. On September 11, 1989, Quintana, Sr., borrowed $1,762,000 from the Bank to purchase 320 acres, for a project known as Vista del Monte. He was listed on the loan agreement as the sole owner of this property. The loan agreement provided that $211,500

---

1. Plaintiff sued under theories of breach of contract and *prima facie* tort as well, in the consolidated case of *Quintana v. First Nat'l Bank of Santa Fe,* No. CIV 92–0876 LH/WWD. These claims were dismissed by the Court by Order dated February 1, 1994.

2. Although the Bank avers that since the time of the loans in question, it has determined that some of the information on financial statements of Quintana, Jr., was inaccurate, I will focus on the facts, as the Bank understood them to be and relied upon in taking the action it took in extending credit, for purposes of my decision on this motion.

was to be included in the loan amount, "to repay the existing note from Garrett Quintana, Jr., to the Bank." (¶ 2.4) It further provided that Quintana, Sr., would pledge a Deed of Trust on a specified amount of square footage on the Calle Lorca property, "owned by Garrett Quintana, Jr.," as security for the Vista del Monte loan. Finally, the agreement provided that Quintana, Sr., would deliver a release to the Bank, executed by Quintana, Jr., Lee Brown, and Merritt Brown (¶ 5.18). This would "release, discharge, indemnify and hold the Bank harmless from all claims, demands, damages, actions, causes of actions and suits of any kind" that the three named individuals had against the Bank. Quintana, Sr., signed this loan agreement on September 8, 1989, and complied with these conditions to credit imposed by the Bank.

8. The parties stipulated after the January 25, 1994, hearing on this motion, that the 1984 loan, mentioned above in Paragraph 1, relating to the purchase of the Sears building (the "Quintana, Jr.—Lincoln Partners note"), was paid in full on November 24, 1989.

9. Quintana, Sr., fully repaid the September 11, 1989, loan in October of 1992.

In his first amended complaint, Quintana sets forth certain actions by the Bank, all related to the September, 1989, loan, which he contends violate the BHCA (See ¶ 7). Specifically, he alleges that the Bank imposed three conditions to the extension of credit, which violate the Act:

(1) The Bank ... required Plaintiff to convince Quintana, Jr., not to sue the Bank; (2) [The Bank required Plaintiff] to borrow from the Bank in addition to the foregoing acquisition cost for the land the sum of $211,500 to pay off the existing note from Quintana, Jr.; and, (3) The Bank further required, as a condition of extension of credit, that the land held in the name of Quintana, Jr., when his note was paid off from the aforesaid loan proceeds be given as further security for the repayment of the sum borrowed.

Quintana, Sr., further pled that he had no desire to do any of these items but did all three in order to obtain financing for the purchase of this acreage.

## II. *Discussion*

I have reviewed the facts of this case against the backdrop of the similar, instructive, and binding Tenth Circuit case of *Palermo v. First Nat'l Bank & Trust Co. of Oklahoma City*, 894 F.2d 363, 367 (10th Cir.1990). *Palermo* presented the issue of whether a bank's insistence that a customer guarantee certain indebtedness of a related entity, before the bank would renew the customer's loan, violated the act. The Tenth Circuit upheld the summary judgement of the trial court, and held that such an arrangement did not violate the act under the facts in that case because the plaintiff failed to establish an anti-competitive practice or that the practice was not within the exemption of traditional banking practices in connection with loans.

Title 12 U.S.C. § 1972 prohibits a bank from imposing certain conditional requirements when granting a customer credit. Section 1972 prohibits tying, reciprocity and exclusive dealing arrangements.

### § 1972. Certain tying arrangements prohibited; ...

(1) A bank shall not in any manner extend credit, lease or sell property of any kind, or furnish any service, or fix or vary the consideration for any of the foregoing, on the condition or requirement—

(A) that the customer shall obtain some additional credit, property or service from such bank other than a loan, discount, deposit or trust service;

\*     \*     \*     \*     \*     \*

(C) that the customer provide some additional credit, property or service to such bank, other than those related to and usually provided in connection with a loan, discount, deposit or trust service;

I review the facts in this case bearing in mind not only the limiting statutory exemptions, but also the statute's purpose, which is to guard against possible "misuse of economic power of a bank" which might result in "a lessening of competition or unfair competitive practices." S.Rep. No. 1084, 91st Cong., 2d Sess. (1970), *reprinted in* 1970 U.S.C.C.A.N. 5519, 5535. Congress did "not intend, how-

ever, that this provision interfere with the conduct of appropriate traditional banking practices." *Id.*

■ I conclude that the uncontroverted facts set forth above establish that the Bank viewed Quintana, Sr., and Quintana, Jr., as affiliated customers. The Bank was aware that Quintana, Sr., conveyed property to Quintana, Jr., in order that Quintana, Jr., could pledge the property as collateral for the 1984 Sears loan. In March of 1989, Quintana, Sr. executed a mortgage to the Bank to further secure payment of the 1984 Sears loan owed by Lincoln Partners, of which Quintana, Jr., was the general partner. In March, 1985, Quintana, Sr., participated in negotiations of a $355,000 loan to one of Quintana, Jr.'s, partnerships. Quintana, Sr., later guaranteed the 1985 loan, and this guarantee was used in connection with a different loan on the property by one of Quintana, Jr.'s, partners. My conclusion that Quintana, Jr., and Quintana, Sr., are affiliated customers and, therefore, related customers under *Palermo* is not based upon their family relationship, but rather, upon the interconnected and overlapping business relationships and transactions which they used to their advantage when applying for additional credit. I am not swayed by Quintana, Sr.'s, arguments that there are some disputed facts about the relationship he and Quintana, Jr., had in these transactions, nor do I find the absence of legal ownership or liability by Quintana, Sr., on some of the involved properties to be dispositive. There is ample uncontroverted evidence linking these two gentlemen for me to conclude they were closely related and affiliated for lending purposes. *See Palermo.*

■ Having so concluded, I will first review the Bank's requirements that Quintana, Sr., pay off Quintana, Jr.'s, Calle Lorca loan and then pledged that property as further security for the September, 1989, loan to Quintana, Sr. I must determine whether the Bank's insistence on these two actions, in exchange for granting of the loan to Quintana, Sr., constituted an impermissible anti-competitive tying or reciprocity arrangement, or whether this was a permissible protection of the Bank's loan assets.

■ As noted by *Palermo*, Section 1972 was not intended to prevent the Bank from taking steps to insure adequate security for its loans. *Id.* at 369. A bank may condition one in-house loan upon another. *See Exchange Nat'l Bank of Chicago v. Daniels*, 768 F.2d 140, 143 (7th Cir.1985), *reh'g granted and denied in part*, 768 F.2d 140. The pertinent portion of the statute says that a "bank shall not ... extend credit ... on the condition or requirement—(A) that the customer shall obtain some additional credit, property, or service from such bank other than a loan ..." 12 U.S.C. § 1972(1). *Palermo* noted that "[I]t would defy economic sense to hold that the bank cannot consider related non-performing loans when deciding whether to renew performing loans". *Id.* at 369. This language indicates to me that the Tenth Circuit considers such a practice to be a "traditional banking practice."

I am aware that Quintana, Sr., has presented the opinion of Philip W. White, a former bank examiner, that the Bank's three conditions to its extension of credit to him are not traditional or acceptable in the banking industry. Mr. White reached his opinion, according to the excerpts from his deposition provided to the Court, after reviewing the facts alleged in the complaint and those set forth in the loan agreement. There is no indication that Mr. White considered whether or not the two banking customers were related, as required by *Palermo*. It would appear that Mr. White was unable to consider the fact that Quintana, Jr.'s, 1984 debt, which was collateralized by a mortgage from Quintana, Sr., was not paid off until November 24, 1989, some two months after the Vista del Monte loan was given. This matter was not clear in the record until inquired into by the Court in January, 1994, and subsequently entered into the record by stipulation. The factual bases for Mr. White's opinions differ materially from the facts upon which I base my opinions, which facts I find most legally significant according to *Palermo*. Accordingly, I find Mr. White's opinions are legally insignificant and afford them no credence.

Quintana, Sr., also sets forth opinions of Theodore J. Strybosch, another banker with

extensive banking experience. In the excerpts from his deposition provided to the Court, Mr. Strybosch offers no opinion as to whether the acts complained of are traditional or acceptable in the banking industry. He did state his opinion that the Anti–Tying Act has been violated, however. Such an opinion is a legal opinion, is within the province of this Court, and I, therefore, give it no consideration.

Even if these opinions were sufficient to establish that the three conditions of the Bank were not traditional or acceptable in the banking industry, Quintana, Sr., has made no showing that the practices complained of were anti-competitive.

■ I read *Palermo* to say that it is not an anti-competitive practice under Section 1972 for a Bank to consider related non-performing loans when deciding whether to renew or grant new performing loans. *Id.* at 369. *Palermo* held that it was permissible for a Bank to insist on a guarantee of corporate indebtedness in exchange for renewal of an individual's credit. In reaching its conclusion, the *Palermo* court noted that "[s]ound credit practices include evaluating affiliated debt prior to extending additional debt." The practices complained of in this case do not differ substantially from the practices at issue in *Palermo* and in the cases cited by *Palermo*. I conclude that the financing arrangement at issue did not constitute an unusual banking practice. In light of my conclusion that these were affiliated customers, I conclude that it was permissible under Section 1972 for the Bank to condition the extension of further credit upon Quintana, Sr., paying off the Calle Lorca loan.

■ A bank may require substituted or additional collateral in connection with a customer's loans without violating Section 1972. *Palermo* at 369, *citing Nordic Bank PLC v. Trend Group, Ltd.,* 619 F.Supp. 542, 557 (D.N.Y.1985). For reasons stated above, I similarly conclude that it was permissible under the act for the Bank to condition the extension of further credit to Quintana, Sr., upon his agreeing to pledge the Calle Lorca property as further security for the 1989 loan.

■ A further allegation of the complaint is that "[t]he Bank ... required Plaintiff to convince Quintana, Jr., not to sue the Bank," and that this was a violation of the BHCA. I evaluate this under Section 1972(1)(C) which prohibits a bank from requiring a customer to "provide some additional credit, property or service to such bank, other than those related to and usually provided in connection with a loan...."

As indicated in Paragraph 7 of the factual section of this opinion, the Bank required Quintana, Sr., to deliver to the Bank the release of Quintana, Jr., Lee Brown, and Merritt Brown, for any and all potential claims that the three individuals might have against the Bank. As noted above, in the *Palermo* case, the Tenth Circuit requires a showing of anti-competitive effects. This requirement for delivery of a release did not prevent Quintana, Sr., from dealing with another bank. He was certainly free to go elsewhere to borrow money for the Vista del Monte project. This condition fits within the statutory exception for appropriate traditional banking practices, for I conclude that such a practice is a conventional effort to protect the Bank's investments. *See Federal Deposit Ins. Corp. v. Linn,* 671 F.Supp. 547 (N.D.Ill.1987) (conditioning of agreement on borrowers' waiver of defenses to certain guaranties, was not anti-competitive and was an appropriate traditional banking practice designed to protect lenders' investments). This condition did not violate the BHCA.

### III. *Conclusion*

I conclude that Quintana, Sr., is unable to make a showing that the three conditions of the Bank to the extension of credit to him were anti-competitive or that they were not traditional banking practices in the lending industry. The uncontroverted facts establish that the Bank viewed Quintana, Jr., and Quintana, Sr., as affiliated borrowers and permissibly sought to protect its loan assets. The Bank Holding Company Act has not been violated. This case will be dismissed. An order in accordance with this memorandum opinion shall be entered.

412

### ORDER AND JUDGMENT

**THIS MATTER** is before the Court on Defendant First National Bank of Santa Fe's Motion for Summary Judgment, filed May 3, 1993 (Docket No. 71). The Court, having heard oral argument of the parties, having reviewed the submissions of the parties, and having entered its memorandum opinion contemporaneously herewith, finds that summary judgment should be granted in the Bank's favor and that this case should be dismissed.

**IT IS, THEREFORE, ORDERED** that Defendant's Motion for Summary Judgment, be, and the same hereby is **granted**. Judgment is entered in favor of Defendant and against Plaintiff. There being no further matter at issue before this Court, this action is **dismissed** in its entirety.