· The CHASE MANHATTAN
BANK, N.A., Plaintiff,

v.

REMINGTON PRODUCTS, INC. and
Victor K. Kiam II, Defendants.

No. 92 Civ. 7983(MEL).

United States District Court,
S.D. New York.

Oct. 19, 1994.

Hertzog, Calamari & Gleason, New York City (Peter E. Calamari, Mark H. Moore, Gerald D. Silver, of counsel), for plaintiff.

Pollack & Greene, New York City (Alan M. Pollack, Scott A. Sommer, Mitchell G. Mandell, of counsel), for defendants.

LASKER, District Judge.

Chase Manhattan Bank, N.A. moves for an order under Fed.R.Civ.P. 56(c) granting summary judgment (1) on its claim that Remington Products, Inc. and Victor K. Kiam, II owe Chase fees under an engagement agreement between Chase and Remington and Kiam's accompanying guarantee of payment and (2) on each of the defendants' four counterclaims. The motion is granted.

## I

Remington, headquartered in Bridgeport, Connecticut, is a manufacturer and seller of electric shaving devices and other personal grooming products. This litigation has its origin in Kiam's simultaneous ownership of 100 percent of the voting stock of Remington and a controlling interest in the New England Patriots National Football League franchise. Kiam formed Remington when he acquired the assets of the Sperry–Rand Corporation's Remington Shaver division in a leveraged buyout in 1979. He purchased his interest in the Patriots in 1988 with the proceeds of a loan (the "Patriots Loan") from IBJ Schroder Bank & Trust Company ("IBJ Schroder"). Kiam pledged his Remington stock as collateral for the Patriots Loan.

Kiam's simultaneous ownership of Remington and a majority stake in the Patriots soon became financially untenable. Remington had pledged all of its assets to secure a $65 million loan (the "RPI Loan") from a consortium of banks and other lending institutions (the "RPI Lenders"). By the Spring of 1991, the RPI Loan was in default and Remington was having difficulty obtaining seasonal financing—that is, working capital to enable Remington to manufacture inventory sufficient to meet consumer demands during the holiday shopping season. At the same time, Kiam had problems servicing the Patriots Loan and was under pressure from IBJ Schroder. Kiam's attempts to refinance the Patriots Loan were unsuccessful, at least in part because his most significant asset—his Remington stock—was already employed as collateral for the Patriots Loan. Kiam also faced the threat of litigation over loans received from other personal creditors.

During this period, Kiam apparently came to the conclusion that some form of refinancing, merger or sale involving either Remington or the Patriots would be necessary both to meet the debt service on the Patriots Loan and to obtain badly needed working capital for Remington. His initial step in this regard appears to have been toward the investment bank Bear Stearns & Co., Inc.. In April 1991, Kiam sought Bear Stearns' advice as to how Remington's standing with the RPI Creditors might be improved and how Remington might obtain seasonal financing. While Kiam pursued these discussions with Bear Stearns, he sought from various lending institutions a personal loan to be secured by his Manhattan cooperative apartment. The attempt to obtain a mortgage loan was unsuccessful, as were Bear Stearns' early attempts to obtain new financing for Remington.

In May 1991, in search of a mortgage loan, Kiam contacted Gerald Daniello of Chase's Stamford, Connecticut office. During the course of their negotiations, Kiam and Chase also discussed the possibility of Chase's mergers and acquisitions department representing and advising Remington in a sale, merger or refinancing. The parties disagree on the extent, if any, to which Kiam's receipt of a mortgage loan was conditioned on Chase's being retained as Remington's financial advisor. Kiam contends that his desire was to retain Bear Stearns as Remington's financial adviser; Chase, he maintains, used

his need for a personal loan to force his hand in favor of selecting Chase. Chase denies any attempt to condition Kiam's Loan on its being hired by Remington and insists that Remington sought its advice as to a strategy to repay the RPI Lenders. In any event, on May 21, 1991, Kiam received a $3 million personal loan from Chase's private banking division. While Chase's internal credit approval memorandum did note the fact that Remington had retained Chase's mergers and acquisitions department, the only evidence either party has produced on the factual issue of whether Chase conditioned (or "tied") Kiam's receipt of a mortgage loan on Chase's retention as Remington's financial advisor is conflicting affidavit and deposition testimony.

Its reasons for doing so aside, on May 23, 1991 Remington signed an "engagement letter" with Chase (the "May 23 Letter") naming Chase as its financial advisor in connection with a range of potential transactions, including investments in, or a sale of, Remington. At the same time, Kiam executed a letter of guarantee in favor of Chase, pursuant to which Kiam guaranteed payment of Chase's fee.

On June 26, 1991, in response to mounting pressure to repay, respectively, the RPI Loan and the Patriots Loan, Remington and Kiam jointly entered into an "RPI Sale and Intercreditor Agreement" (the "Intercreditor Agreement") among themselves, the RPI Lenders and IBJ Schroder. The Intercreditor Agreement contained three key provisions. First, Remington and Kiam were obligated to use their "best efforts to effect or cause to be effected (and not hinder the consummation of)" an "Acceptable Transaction" (essentially defined as a transaction generating proceeds sufficient to satisfy the RPI Loan) by May 31, 1992, with an auto-

matic extension to June 30, 1992. Second, the Agreement recognized that Chase had been retained as Remington's financial advisor and obligated Remington to cause Chase to keep the RPI Lenders and Schroder informed as to the progress of their efforts toward closing an Acceptable Transaction. Third, the Agreement required Kiam to grant Chase an irrevocable proxy under which Chase was authorized to vote Kiam's Remington shares in favor of—and consummate—an Acceptable Transaction in the event Kiam refused to do so, provided that Chase could in good faith issue an opinion that the terms of the transaction were fair from a financial standpoint to both Remington and Kiam. Under this provision Remington also gave Chase certain requisite powers of attorney.

On June 26, Remington and Chase also signed an amendment to the May 23 Letter ("the Amendment Letter" and, collectively with the May 23 Letter, the "Engagement Agreement"). The effect of the Amendment Letter was to coalesce the terms of the Engagement Agreement with those of the Intercreditor Agreement. Section 1 of the Engagement Agreement—entitled "Services to be Rendered"—obligated Chase to provide the following "financial advisory services":

(a) Chase will develop and maintain a continuing familiarity with the financial situation and plans of the Company [i.e., Remington] with a view to fulfilling its role as financial advisor;

(b) Chase will evaluate and recommend financial and strategic alternatives with respect to a Transaction [1];

(c) Chase will assist the Company in preparing an information memorandum for distribution to potential buyers, describing

---

1. "Transaction" was defined as follows in section 1 of the Engagement Agreement:

For purposes of this agreement, a "Transaction" shall mean, whether in one or a series of transactions, (i) any merger, consolidation, reorganization, recapitalization, leveraged buyout, restructuring or other business combination or transaction involving the Company [i.e., Remington], (ii) the disposition by the Company or any of its shareholders, directly or indirectly, through public or private sales or other-

wise of all or any portion of the assets, securities, properties, or businesses of the Company, (iii) the formation of a joint venture, partnership, or special purpose vehicle for the purpose of combining all or any portion of the assets, securities, properties, or businesses of the Company, or (iv) any management, consulting, supply, service, distribution, licensing agreement, or similar arrangement involving the Company or any of its shareholders and a potential purchaser.

the Company based upon information supplied to Chase by the Company;

(d) Chase will identify and contact potential purchasers, approved in advance by the Company, in respect of a proposed Transaction, advise the Company concerning the strategy and tactics of negotiations with such potential purchasers, and assist in such negotiations;

(e) Chase will advise the company with respect to the timing, structure, and pricing of a Transaction;

(f) Within a reasonable time after a request by the Company, Chase will render (i) a written opinion ... as to the fairness ..., from a financial point of view, of the consideration to be received by the Company, or its common stockholders, as the case may be, in connection with a Transaction and (ii) an appraisal ... of the fair market value ... of the non-cash portion, if any, of the consideration to be ... received in such Transaction....; and

(g) Chase will provide such additional financial advisory services as from time to time may be mutually agreed upon by the Company and Chase.

Section 7 of the Engagement Agreement—entitled "Additional Services to be Rendered"—listed a number of further services to be provided by Chase, each of which was contemplated by the Intercreditor Agreement. These included (i) possession of the irrevocable proxy and power of attorney to vote Kiam's Remington shares in favor of a Transaction over Kiam's objection, (ii) production of monthly progress reports, (iii) production of a preliminary report on transactions that appeared promising (iv) production of a fairness opinion and appraisal on Chase's own initiative in the event Remington failed to request the fairness opinion called for in section 1 and (v) use of the irrevocable proxy and power of attorney to vote Kiam's shares in favor of a proposed Transaction if a preliminary report indicated that it was capable of generating proceeds sufficient to satisfy the RPI Loan. In recognition of the fact that Chase's role in providing these services raised ethical concerns because of Chase's role in providing the services enumerated in section 1, section 7 of the Engagement Agreement also provided in part as follows:

The Company [e.g., Remington] acknowledges that [the] duties and responsibilities [set forth in section 7] may represent a potential conflict of interest for Chase in light of the other services Chase has agreed to provide the Company in Section 1 hereof. The Company hereby agrees that the performance by Chase of the additional services specified in this Section 7 shall not constitute a conflict of interest for purposes of Chase's other services hereunder and expressly waives its right to assert any such conflict against Chase.

The Engagement Agreement was to expire on May 23, 1991. However, under section 3, Remington was obligated to pay Chase a fee if, "during the term of th[e] agreement [or] at anytime within twelve months thereafter," a Transaction was consummated, or an agreement was signed that resulted in a "Transaction being consummated." Thus, the Engagement Agreement provided that if a Transaction (or an agreement leading to a Transaction) was in place by the end of a one year "tail period" (that is, by May 23, 1993), Chase would receive a fee under the same terms and in the same manner as during the term of the Agreement. Remington could cancel the Engagement Agreement at any time with fifteen days written notice. However, if it did so, Chase would nonetheless be paid as if the Agreement remained in force for the full term.

Though the parties dispute the effectiveness of and motives behind Chase's efforts on Remington's behalf, the record demonstrates that Chase engaged in substantial activity on Remington's behalf throughout late 1991 and early 1992. The evidence establishes that Chase (1) arrived at a preliminary timetable for the initial stages of the transaction process by the end of May 1991 (Plaintiff's Exhibit 17), (2) made requests for company information (Plaintiff's Exhibits 18–19), (3) assisted in the preparation of the information memorandum contemplated by section 1(c) of the Engagement Agreement (Plaintiff's Exhibit 28), (4) provided Remington with lists of potential investors (Plaintiff's Exhibits 20–24 and 29), (5) arranged on-site visits to Rem-

ington's plant for potential investors (Plaintiff's Exhibit 30) and (6) kept Kiam informed as to Chase's progress (Plaintiff's Exhibits 25–26). Chase's report of January 7, 1992 indicates that by that time it had made initial contact with 141 investors, four of whom would make proposals to purchase Remington by the end of the month. Two of those four bids—the so-called "Warburg" and "Kohlberg" proposals—would have provided Kiam with several million dollars more than the amount necessary to pay off the RPI Lenders.

Dissatisfied with this choice of bids as well as Chase's efforts on their behalf generally, Remington and Kiam began, sometime during January or February of 1992, to solicit investors independently of Chase. According to Kiam, it had been his preference from the time the Engagement Agreement was signed that any transaction that Remington entered into be a financing arrangement (i.e., an equity or debt offering, a joint venture or the formation of a partnership) rather than an outright sale of the company or its assets. Kiam was particularly interested in maintaining control of Remington.

In July 1992, Kiam entered into a transaction (the "Perlmutter Transaction") with Isaac Perlmutter that constituted a Transaction within the meaning of the Engagement Agreement with Chase. While it is unclear from the record whether it was expected—or Kiam believed—at the time the Perlmutter Transaction was consummated that Kiam would remain in charge of Remington, Kiam preferred Isaac Perlmutter's proposal to any proposal received by Chase.

The record is unclear as to when precisely Chase demanded, and Remington refused to pay, its fee. Chase has submitted correspondence and memoranda which indicate strongly that as late as July 1992 Remington did not dispute that Chase was owed compensation for its services. Whatever negotiations occurred on this topic ended on October 29, 1992, however, when Chase filed this suit, alleging that Remington's failure to pay it a fee constituted a breach of the Engagement Agreement and that Kiam was liable as guarantor. Remington's and Kiam's answer denies the substance of Chase's complaint and asserts counterclaims to the effect that (1) Chase's failure to perform its obligations under the Engagement Agreement constituted a breach of contract, (2) Chase "tied" Kiam's receipt of a mortgage loan to Chase's selection as Remington's investment banker in violation of the Bank Holding Company Act ("BHCA"), 12 U.S.C. §§ 1971–78, (3) Chase negligently managed the process of attracting investors, thereby forcing Remington to pursue the Perlmutter Transaction, which they describe as disadvantageous, and incur costs they otherwise would have avoided and (4) Chase breached its fiduciary duty to Remington by pursuing its own interests and the interests of the RPI Lenders at the expense of Remington. As noted above, Chase moves for summary judgment on its claim and on each of these counterclaims.

## II

The dispositive issue is whether Chase has fulfilled its obligations under the Engagement Agreement. Although the defendants contend that there is a genuine dispute as to the intent of the parties in drafting the Agreement, neither party argues that the terms of the Agreement are ambiguous. Chase claims that under the Engagement Agreement it performed the required services and is entitled to be paid. Remington and Kiam disagree, arguing that summary judgement is inappropriate, not only because the intent of the parties is a material fact in dispute, but because Chase failed to perform the services it was obligated to perform under the Agreement, in particular because Chase failed to adopt Kiam's preference for attracting an investor in, rather than a purchaser of, Remington. I conclude that Chase is correct.

There is little doubt as to the services Chase was obligated to provide under the Engagement Agreement. While section 1 required Chase to "assist" Remington, "identify" options, "recommend" courses of action, and "advise" Remington as to its various options regarding Transactions, that is all it required Chase to do. Whatever the defendants' intention was, the Engagement Agreement does not, and cannot reasonably be construed to, mandate Chase to seek an in-

vestor in Remington before turning to the option of a sale of Remington stock or assets. Chase was under no obligation to do Kiam's bidding as long as it could opine in good faith that its actions were fair from a financial standpoint.

■ Nor does section 3 condition Chase's receipt of a fee on its bringing about a Transaction or on the consummation of any particular type of Transaction. The sole prerequisite to payment listed in section 3 is the consummation of a Transaction (or the signing of an agreement that results in a Transaction). As both Kiam and his attorney, Arthur Emil, recognized on deposition, *see* Plaintiff's Reply Exhibit 3 at 451–52; Plaintiff's Reply Exhibit 4 at 453–54, section 3 does not even condition Chase's entitlement to a fee on its being involved in a consummated transaction.[2]

■ The record clearly establishes that Chase did in fact provide the services called for in the Engagement Agreement and that all conditions precedent to Chase's being entitled to payment have occurred. As described above, Chase has submitted extensive evidence of advice and representation provided Remington by Chase directed toward the consummation of a transaction the form of which was clearly contemplated in the Engagement Agreement. Nothing in the Engagement Agreement prohibited Chase from pursuing particular types of Transactions to the exclusion of others.

Accordingly, Chase's motion for summary judgment on its claim that the defendants are in breach of the Engagement Agreement is granted. Moreover, since the guarantee is unambiguous and the sole condition precedent to its becoming operative—that is, the liability of Remington—has occurred, Chase's motion for summary judgment on its claim against Kiam is also granted.

### III

It follows from the foregoing discussion of Chase's claims that Chase's motion for summary judgment dismissing the defendants' counterclaim for breach of contract must be granted. As discussed above, there is no genuine issue whether Chase performed adequately under the Engagement Agreement and the defendants have failed to call into question Chase's substantial evidence of performance.

### IV

■ The defendants allege that Chase made Kiam's receipt of a mortgage loan contingent on Chase's being chosen as Remington's financial advisor in violation of the antitying provisions of the BHCA. 12 U.S.C. § 1972 reads in pertinent part as follows:

(1) A bank shall not in any manner extend credit, lease or sell property of any kind, or furnish any service, or fix or vary the consideration for any of the foregoing, on the condition or requirement—

(A) that the customer shall obtain some additional credit, property, or service from such bank other than a loan, discount, deposit, or trust service . . .

12 U.S.C. § 1975 creates a private right of action and an award of treble damages to "[a]ny person who is injured in his business or property by reason of anything forbidden in section 1972. . . ." The defendants allege that, before extending Kiam a personal loan, Chase imposed the "condition or requirement" that Remington obtain the services of the Chase mergers and acquisitions department.

While the issue of whether tying actually took place remains, Remington and Kiam fail to point to any injury or measure of damages upon which to recover under the statute. Indeed, in light of the fact that Remington consummated a Transaction and Kiam received a mortgage loan on market terms, it is difficult to envision precisely what form of injury Remington or Kiam could possibly allege. To the extent that the defendants assert Chase's alleged tying activity as a

---

**2.** The Defendants' attempt to minimize the significance of the plain meaning of section 3 by arguing that, in drafting section 3, the parties could not possibly have intended that Chase be paid regardless of whether it spent little or no effort on Remington's behalf. It may be that this argument would come into play if Chase simply ignored its responsibilities entirely. As the record indicates, however, such was not the case.

defense to Chase's claim, the law is against them. Section 1975 clearly states that the only private remedy available under the BHCA is "three times the amount of damages sustained" by the plaintiff. The statute does not absolve successful § 1975 plaintiffs from the obligation to fulfill contracts that result from a tying arrangement. *See Exchange National Bank of Chicago v. Daniels*, 768 F.2d 140, 144 (7th Cir.1985) (even if tying pressure is applied in connection with a loan application, "an obligation to pay back a loan is not an injury"). Accordingly, Chase's motion for summary judgment dismissing the defendants' BHCA counterclaim is granted.

## V

■ The defendants allege that Chase engaged in various forms of negligent behavior during the period of the parties' contractual relationship, among them "fail[ure] to explore other avenues of alternative financing," "failure to have a sales agreement drafted and sent to all prospective investors," "artificially accelerating the bidding process" and "failing to consummate a 'suitable' transaction." The merit of these allegations aside, Chase correctly notes and the defendants do not contest, with certain exceptions not relevant here, that New York does not recognize a cause of action for negligent performance of a contract. *See Clark–Fitzpatrick, Inc. v. Long Island Railroad Company*, 70 N.Y.2d 382, 521 N.Y.S.2d 653, 656–57, 516 N.E.2d 190, 192–94 (Ct.App.1987) (breach of contract is not a tort unless the breach violates a legal duty that is independent of the contract). Chase's motion for summary judgment dismissing the Defendant's negligence counterclaim is therefore granted.

## VI

■ The defendants' final counterclaim is that Chase's conduct constituted a breach of fiduciary duty. A fiduciary duty exists " 'when one person is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation.' " *Flickinger v. Harold Brown & Co., Inc.*, 947 F.2d 595, 599 (2nd Cir.1991). However, the scope of the duty can be limited by contract. *See Riviera Congress Associates v.*

*Yassky*, 18 N.Y.2d 540, 277 N.Y.S.2d 386, 392–93, 223 N.E.2d 876, 879–80 (Ct.App.1966) (limited partners may contract away the right to bring an action against the general partner for self-dealing). The defendants allege that Chase's fiduciary duty was violated when Chase "pursued its own self interest and that of the RPI Lenders rather than that of Remington, intentionally mischaracterized an expression of interest as an exploding preemptive bid ... and brazenly advised potential investors that it could sell Remington without Kiam's consent."

The defendants have submitted no evidence supporting the claim that Chase violated the fiduciary duty it owed Remington. The defendants' argument proceeds on the assumption that Chase signed an agreement, in Remington's expert's words, to "advise and assist Remington in facilitating and effectuating *a transaction of Remington's choosing ...*" (emphasis in original). Hurley Affidavit at 6, Affidavits in Opposition to Plaintiff's Motion for Summary Judgment. This is not correct. Kiam's preferences as to the form and timing of a Transaction were irrelevant as a legal matter. Chase's role was to find—and, if necessary, require Remington to accept—a transaction that would satisfy the RPI Loan. The record contains no evidence to suggest that Chase pursued any agenda other than the one contemplated by the parties to the Engagement and Intercreditor Agreements. Chase's motion for summary judgment dismissing this counterclaim is therefore granted.

\*　　\*　　\*　　\*　　\*　　\*

Chase's motion for summary judgment on its claim that Remington is in breach of the Engagement Agreement and Kiam is in breach of the May 23, 1991 guarantee is granted. Chase's motion for summary judgment dismissing the defendants' counterclaims is also granted.

Submit judgment on notice.